(No. 86065.—

GREGORY NICHOL *et al.*, Appellants, v. JOHN STASS *et al.*, Appellees.

*Opinion filed August 10, 2000.*

HEIPLE and FREEMAN, JJ., dissenting.

John C. Wunsch, of Chicago, for appellants.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Diane M. Potts, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE MILLER delivered the opinion of the court:

The plaintiffs, Gregory Nichol and Ruby Nichol, brought this action in the circuit court of Cook County individually and as cospecial administrators of the estate of the decedent, Jonathan Nichol, against the defendants, John Stass and Bonnie Stass, and the Human Enrichment and Developmental Association (HEDA), an independent child welfare agency. The plaintiffs alleged that Jonathan, their son, died while in the care of the Stasses, who were acting as Jonathan's foster parents at the time of his death and who were allegedly under the supervision of HEDA. The plaintiffs sought recovery from the defendants under several different theories. The trial judge dismissed the plaintiffs' action against the Stasses on the ground that it was barred by sovereign immunity. The appellate court affirmed. 297 Ill. App. 3d 557. We allowed the plaintiffs' petition for leave to appeal (177 Ill. 2d R. 315(a)), and we now reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court for further proceedings.

According to the allegations in the complaint, Jonathan died on June 16, 1995, while at the Stasses' home and in their care, by drowning in a toilet. He was two years old. The plaintiffs sought recovery from each of the defendants under the Wrongful Death Act (740

ILCS 180/1 (West 1996)), the Rights of Married Persons Act (750 ILCS 65/15 (West 1996)), and the Survival Act (755 ILCS 5/27—6 (West 1996)), alleging that the defendants negligently violated various duties imposed by the common law and by administrative regulations, and, further, that liability was established under the doctrine of *res ipsa loquitur.* The complaint alleged that the Stasses failed to supervise Jonathan, failed to protect him from hazards within the home, failed to provide him with sufficient food and water, and failed to provide him with immediate medical care after the occurrence. The amended complaint described HEDA as an independent licensed child welfare agency that has contracted with the Department of Children and Family Services "to provide supervision, inspections, management, guidance and discipline" to foster parents and foster children. The amended complaint further asserted that HEDA "was in charge of, supervisor of, manager of, and director of" the Stasses. The plaintiffs alleged, among other things, that HEDA negligently failed to supervise the Stasses, failed to ensure that the child was provided with adequate food and water, failed to complete background checks on the Stasses, and failed to place the child in a home "free from observable hazards."

Pursuant to sections 2—619(a)(1) and (a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(1), (a)(9) (West 1996)), the Stasses moved to dismiss the counts of the amended complaint that were directed against them, arguing that the claims were barred by the doctrines of sovereign immunity and public officials' immunity. Following a hearing, the trial judge stated that he would deny the Stasses' motion. Counsel for the Stasses then advised the trial judge that a pending case in the appellate court raised a similar issue, and the judge said that he would postpone his ruling on the motion until the outcome of the appeal was known. The appellate court

soon filed its opinion in the other case, *Griffin v. Fluellen*, 283 Ill. App. 3d 1078 (1996), holding that the foster parent named as a defendant in that action was a state employee and could invoke the protection of the sovereign immunity doctrine. In a later proceeding in the case at bar, the trial judge concluded that he was required to follow *Griffin* and granted the Stasses' motion to dismiss. The trial judge also entered a finding pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) permitting the plaintiffs to appeal immediately from that ruling; the plaintiffs' separate claims against HEDA remained pending in the circuit court of Cook County, and they are not at issue in this appeal.

The appellate court affirmed the circuit court's dismissal order. 297 Ill. App. 3d 557. The appellate court believed that the Stasses should be considered agents of the state and therefore could assert the protection of the sovereign immunity doctrine. The court theorized that the state owed the foster child a nondelegable duty of care and that the state would therefore be vicariously liable for the foster parents' conduct. The court rejected the plaintiffs' contention that the Stasses, even as agents of the state, could still be liable for Jonathan's death because they owed the child a duty of care that was entirely independent of their status as foster parents. We allowed the plaintiffs' petition for leave to appeal. 177 Ill. 2d R. 315(a).

Before this court, the plaintiffs contend that the defendants are neither employees nor agents of the state and therefore cannot avoid suit through the sovereign immunity doctrine. The Stasses, in response, maintain that the lower courts correctly concluded that they are state employees or agents and that the plaintiffs' action against them is one in substance against the State of Illinois, triggering the sovereign immunity doctrine. The Stasses also argue, as an alternative ground in support of

the judgments below, that even if they are not protected from suit by sovereign immunity, they may still assert parental immunity as an affirmative defense to the plaintiffs' action. We will consider these contentions in turn.

Article XIII, section 4, of the Illinois Constitution provides, "Except as the General Assembly may provide by law, sovereign immunity in this State is abolished." Ill. Const. 1970, art. XIII, § 4. The legislature has reinstated sovereign immunity. Section 1 of the State Lawsuit Immunity Act reads:

> "Except as provided in the 'Illinois Public Labor Relations Act', enacted by the 83rd General Assembly, or except as provided in 'AN ACT to create the Court of Claims, to prescribe its powers and duties, and to repeal AN ACT herein named', filed July 17, 1945, as amended, the State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 1996).

Section 8(d) of the Court of Claims Act grants the court of claims exclusive jurisdiction over, among other matters, "[a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit." 705 ILCS 505/8(d) (West 1996).

In *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990), this court summarized the scope and effect of the preceding provisions:

> "Whether an action is in fact one against the State, and hence one that must be brought in the Court of Claims, depends not on the formal identification of the parties but rather on the issues involved and the relief sought. (*Herget National Bank v. Kenney* (1985), 105 Ill. 2d 405, 408; *Hudgens v. Dean* (1979), 75 Ill. 2d 353, 355-56; *Moline Tool Co. v. Department of Revenue* (1951), 410 Ill. 35, 37.) Thus, the prohibition 'against making the State of Illinois a party to a suit cannot be evaded by making an action nominally one against the servants or agents of the State when the real claim is against the State of Illinois itself and when the

State of Illinois is the party vitally interested.' (*Sass v. Kramer* (1978), 72 Ill. 2d 485, 491.) Sovereign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court. *Senn Park Nursing Center v. Miller* (1984), 104 Ill. 2d 169, 188-89; *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 548; *Moline Tool Co.*, 410 Ill. at 37; *Schwing v. Miles* (1937), 367 Ill. 436, 441-42."

A threshold question in the present appeal is whether the defendants are in fact state employees or agents. If they are neither, then the doctrine of sovereign immunity can have no application here. The appellate court has reached conflicting results on the question whether foster parents are either agents or employees of the state. In the present case and in *Griffin v. Fluellen*, 283 Ill. App. 3d 1078 (1996), cited by the trial judge below, the appellate court concluded that foster parents are state agents or employees and therefore are protected from suit by the doctrine of sovereign immunity. The appellate court reached the opposite result in *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510 (1997), and in *Swanigan v. Smith*, 294 Ill. App. 3d 263 (1998), holding in those cases that foster parents are not state agents or employees and therefore cannot assert immunity from suit under the doctrine of sovereign immunity. We conclude in the present case that the defendants have failed to establish that they are state employees or agents.

The Foster Parent Law does not describe foster parents as either employees or agents. 20 ILCS 520/1—10, 1—15, 1—20 (West 1996). Nor are foster parents deemed state employees in any of a variety of statutes relating to state employment. See, *e.g.*, 5 ILCS 375/3 (West 1996) (State Employees Group Insurance Act of 1971); 5 ILCS 340/3 (West 1996) (Voluntary Payroll Deductions Act of 1983); 5 ILCS 410/10 (West 1996) (State Employment Records Act); 5 ILCS 365/2 (West 1996) (State Sal-

ary and Annuity Withholding Act); 40 ILCS 5/14—103.05 (West 1996) (State Employees Retirement System of Illinois). The record in the present case is not entirely clear concerning the relationship among the Stasses, HEDA, and the Department of Children and Family Services. According to the allegations in the complaint, HEDA, an independent child welfare organization, was "in charge of, supervisor of, manager of, and director of" the Stasses as foster parents. Neither side appended to any of their pleadings copies of the contracts between the Department and HEDA and between HEDA and the Stasses. To be sure, it was the defendants' motion to dismiss, and therefore it was their duty to supply a record in support of their motion. In the absence of those documents, and in light of the relevant statutes and the allegations in the plaintiffs' amended complaint, we must conclude that the Stasses were independent contractors rather than employees or agents of the state.

The Stasses argue, however, that, as foster parents, they were subject to a diverse and comprehensive set of requirements concerning their care for foster children. For example, the Department regulates the cleanliness, temperature, and lighting of a foster home. 89 Ill. Adm. Code § 402.8(a) (1996). Pets in the home must be inoculated against rabies. 89 Ill. Adm. Code § 402.8(e) (1996). Foster parents must develop and rehearse fire evacuation plans. 89 Ill. Adm. Code § 402.8(g) (1996). Foster parents must provide a child with closet and dresser space (89 Ill. Adm. Code § 402.8(h) (1996)) and adequate bedding (89 Ill. Adm. Code § 402.9 (1996)). Meals and discipline are also subject to extensive regulation. 89 Ill. Adm. Code §§ 402.11, 402.21 (1996).

We do not believe that the preceding measures are anything more than licensing requirements or that they serve to establish the defendants' role as state employees or agents. The state licenses a broad range of activities

and professions, often in regulations as detailed and encyclopedic as those involved here. See, *e.g.*, *Pre-School Owners Ass'n of Illinois, Inc. v. Department of Children & Family Services*, 119 Ill. 2d 268 (1988) (licensing requirements for day-care centers). The existence of those administrative requirements, however, does not mean that the persons subject to them are state employees or agents.

Nor is state employment established, for purposes of sovereign immunity, through the State Employee Indemnification Act. Section 1(b) of the Indemnification Act provides, "For the purpose of this Act," in pertinent part:

> "The term 'employee' means *** individuals who serve as foster parents for the Department of Children and Family Services when caring for a Department ward, *** but does not mean an independent contractor except as provided in this Section." 5 ILCS 350/1(b) (West 1996).

"Employees" under the Indemnification Act are entitled to representation by the Attorney General in civil proceedings stemming from "any act or omission occurring within the scope of the employee's State employment." 5 ILCS 350/2(a) (West 1996). "Employees" also are entitled to indemnification under the Act for any adverse judgment unless "the conduct or inaction which gave rise to the claim or cause of action was intentional, wilful or wanton misconduct and was not intended to serve or benefit interests of the State." 5 ILCS 350/2(d) (West 1996). We note that the Attorney General's office has represented the Stasses throughout these proceedings.

Even though the Indemnification Act terms foster parents "employees," we do not believe that the provision must be construed as establishing foster parents' position as state employees for purposes of sovereign immunity. Rather, the preceding definition simply affirms the entitlement of foster parents to indemnification, without also establishing, for other purposes, their status

as government employees or agents. As noted, the provision in the Indemnification Act begins with the restrictive phrase "For the purposes of this Act," limiting the scope of the ensuing definition. Moreover, section 1 of the Act expressly recognizes that some independent contractors might be considered "state employees" for purposes of indemnification, but the provision does not purport to alter their status as independent contractors for all other purposes.

The appellate court also believed that sovereign immunity could be invoked in the present case because, whether or not the defendants are deemed state agents or employees, the state owed Jonathan, a ward of the court, a continuing, nondelegable duty of care. The appellate court further believed that the state would be vicariously liable for conduct of the foster parents in violation of that duty.

We do not disagree with the broad proposition that the state owes certain duties to persons whom it places · in state-run institutions (see *Youngberg v. Romeo*, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982)) or even in private care (*K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990); *Doe v. New York City Department of Social Services*, 649 F.2d 134 (2d Cir. 1981)). Those cases are not applicable here, however. In general, they involve actions under section 1983 (42 U.S.C. § 1983 (1994)) against the state or state officers, and they concern what degree of misconduct must be shown to give rise to public liability for injuries occurring to a state ward while in private custody. Notably, state liability in those circumstances does not extend to state misconduct that is "merely negligent [citation] or even grossly negligent." *K.H.*, 914 F.2d at 852. The court in *K.H.* thus framed the issue before it as follows:

> "We emphasize that the issue is not whether the state's duty follows the child into the private home in which he is placed. We may assume, without having to decide, that it

does not, that the foster parents, even if paid by the state, are not state agents for constitutional purposes. *** The only right in question in this case is the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser." *K.H.*, 914 F.2d at 852.

The issues raised in the present case are far different from those involved in the cases cited previously. The plaintiffs in this action are not attempting to recover from the state for its decision to place Jonathan with the Stasses, and we do not believe that the state must be considered the real party in interest in this proceeding.

The appellate court below cited section 424 of the Restatement (Second) of Torts in support of its nondelegable duty analysis. Section 424 provides:

"One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions." Restatement (Second) of Torts § 424, at 411 (1965).

We do not believe that section 424 is applicable here. Under the circumstances envisioned by section 424, it is the principal in the first instance, and not the independent contractor, who must be required by statute or regulation to provide specified safeguards. In the present case, however, it is the principal—the state—who has imposed these duties on the independent contractor; the administrative regulations pertinent to this case are imposed by the state on foster parents.

The appellate court also cited sections 214 and 251 of the Restatement (Second) of Agency in support of its discussion of this question. Restatement (Second) of Agency §§ 214, 251 (1958). Section 214 provides:

"A master or other principal who is under a duty to provide protection for or to have care used to protect oth-

ers or their property and who confides the performance of such duty to a servant or other person is subject to such others for harm caused to them by the failure of such agent to perform the duty." Restatement (Second) of Agency § 214 (1958).

Under section 251, a principal may be liable for physical harm caused by the negligence of a "servant or a non-servant agent: (a) in the performance of an act which the principal is under a duty to have performed with care." Restatement (Second) of Agency § 251 (1958). Again, although foster parents are required to comply with numerous administrative regulations, we do not find anything that imposes on the state an independent duty to guarantee compliance by foster parents with those provisions. In addition, the hallmark of a nondelegable duty is the right of the principal "to control physical details as to the manner of performance" by the actor. Restatement (Second) of Agency § 250, Comment *a* (1958). The administrative regulations cited in this case, however, do not go so far.

We agree with the plaintiffs that whatever duty there is to provide placement, to institute procedures, or even to exercise general authority over foster children is not the same as a continuing, nondelegable duty to provide for the care of children placed in foster homes. Moreover, even if a continuing duty can be said to exist, we agree with the plaintiffs' observations that it would pertain to the relationship between the state and the foster children and not to the relationship between the state and foster parents, and that it would not operate to confer sovereign immunity on foster parents.

The Stasses do not renew before this court their contention, raised in the circuit court, that they are protected from liability under the doctrine of public officials' immunity. As a separate ground in support of the judgment below, however, the defendants now contend, for the first time in these proceedings, that they are

shielded from liability by the doctrine of parental immunity. They argue that they stand *in loco parentis* in relation to the foster child and that they must therefore enjoy the same protection from liability that a child's biological parents could assert, if the latter had retained custody of the child.

In *Cates v. Cates*, 156 Ill. 2d 76 (1993), this court reevaluated the doctrine of parental immunity, abrogating its application in a limited number of circumstances. The child in that case was injured in an automobile collision that occurred as she was riding in a car being driven by her father, and the court concluded that the father was not immune from suit. The court distinguished the child's action in that case from conduct inherent to the parent-child relationship, with respect to which the doctrine of parental immunity survived. The court explained:

> "Thus, under our standard, parental discretion in the provision of care includes maintenance of the family home, medical treatment, and supervision of the child. A child may attempt to sue a parent alleging that the child fell on a wet, freshly mopped floor in the home, but the immunity would bar such an action because the parent was exercising his discretion in providing and maintaining housing for the child." *Cates*, 156 Ill. 2d at 105.

Courts in other states are divided on this question, with some jurisdictions allowing the assertion of parental immunity by foster parents (*Mitchell v. Davis*, 598 So. 2d 801 (Ala. 1992); *Brown v. Phillips*, 178 Ga. App. 316, 342 S.E.2d 786 (1986)), and other jurisdictions denying it (*Mayberry v. Pryor*, 422 Mich. 579, 374 N.W.2d 683 (1985)). We conclude that a limited form of parental immunity should be available in negligence actions against foster parents. It should be noted that one of the decisions cited favorably by *Cates, Goller v. White*, 20 Wis. 2d 402, 122 N.W.2d 193 (1963), recognized a limited form of parental immunity in an action against a foster parent. Moreover, although the relationship between foster

parents and foster children is not identical with the relationship between biological parents and their children, we believe that it would be anomalous to reject some form of the defense in these circumstances. The rationale identified by the *Cates* court as justifying the retention of some portion of the doctrine—the preservation of parental authority and discipline (*Cates*, 156 Ill. 2d at 103-04)—is also applicable in the foster parent setting. Although foster parents receive compensation for their role, they exercise a substantial amount of discretion in discipline, supervision, and care, areas in which *Cates* found immunity to be appropriate. As the appellate court observed in *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510, 517 (1997), in allowing foster parents to assert parental immunity:

> "Unquestionably, foster parents under the circumstances of the Augsburgers have responsibility in regard to the supervision and discipline of those children under their care. Negligence in that regard is what is charged here. Foster parents are nearly as much in need of leeway in this regard as are natural parents. Often animosity can exist between natural parents and foster parents. Exposure to suit for negligence in supervising and disciplining the children in their custody would be a deterrent to the best performance by the foster parents in this regard. We find no precedent for denying parental immunity here and deem the granting of it consistent with the theory of *Cates*."

An analogous situation arises in the educational context. In *Kobylanski v. Chicago Board of Education*, 63 Ill. 2d 165 (1976), this court determined that sections 24—24 and 34—84a of the School Code (Ill. Rev. Stat. 1967, ch. 122, pars. 24—24, 34—84a), which conferred upon teachers the status of parents or guardians, entitled teachers to a qualified immunity for their actions in supervising and disciplining students. In a later case, *Gerrity v. Beatty*, 71 Ill. 2d 47 (1978), this court examined the considerations of public policy underlying the earlier

decision in *Kobylanski*. Referring to sections 24—24 and 34—84a of the School Code, the court explained:

"The statutory provisions in question reflect a legislative determination that the orderly conduct of the schools and the maintenance of a sound learning atmosphere require that there be a personal relationship between teacher and student in which the teacher has disciplinary and supervisory authority similar to that which exists between parent and child. It is evident that this relationship would be seriously jeopardized if teachers and school districts were amenable to ordinary negligence actions for accidents occurring in the course of the exercise of such authority." *Gerrity*, 71 Ill. 2d at 51.

We believe that a similar rationale provides further support for our decision to extend a qualified form of parental immunity to foster parents. Like teachers, foster parents receive compensation for their work. Moreover, the relationship between a foster parent and a foster child, like the relationship between a teacher and a student, is not permanent and may even be relatively brief. Yet foster parents, like teachers and biological parents, are responsible for a broad range of decisions affecting the vital interests of the children involved. It would be anomalous to grant a qualified immunity to educators and biological parents but to deny immunity entirely to foster parents, who, in their relationships with their foster children, share many important similarities with the others. Thus, it can be seen that our result in this case does not represent an undue expansion of the immunity doctrine; rather, our holding is entirely consistent with this court's previous decisions recognizing immunity for persons who stand *in loco parentis* to children.

To be sure, the defendants correctly suggest that the scope of parental immunity in this context must be tempered by the circumstances peculiar to the foster-child relationship. Thus, the defendants acknowledge that parental immunity should not be available when,

for example, the underlying conduct resulted in the revocation of a foster parent's license or a finding of neglect, or when it is the subject of a criminal charge. The defendants also suggest that any recognized immunity should not override Department regulations to the contrary. We believe that these are appropriate restrictions on the scope of the immunity in these circumstances.

As we have noted, the Stasses moved to dismiss the present action under sections 2—619(a)(1) and (a)(9) of the Code of Civil Procedure. They did not, however, raise the defense of parental immunity in the circuit court, choosing at that time to assert only the defenses of sovereign immunity and public officials' immunity. Nonetheless, "[i]mmunity from suit is an 'affirmative matter' properly raised under section 2—619(a)(9)" (*Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997)), and thus parental immunity could similarly be pleaded as a defense to the present action in a motion for dismissal under section 2—619.

The affirmative subject matter asserted by a defendant pursuant to section 2—619(a)(9) must appear on the face of the plaintiff's complaint or be supported by affidavit or other evidentiary material. *Epstein*, 178 Ill. 2d at 383; *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993). "Once a defendant satisfies this initial burden of going forward on the section 2—619(a)(9) motion to dismiss, the burden then shifts to the plaintiff, who must establish that the affirmative defense asserted either is 'unfounded or requires the resolution of an essential element of material fact before it is proven.' *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116." *Epstein*, 178 Ill. 2d at 383.

The Stasses did not submit any affidavits or other material in support of their dismissal motion, even under the two theories they pursued in the circuit court, so in considering the defense of parental immunity we are nec-

essarily limited to an examination of the amended complaint, and an assessment of whether the allegations in the amended complaint on their face disclose that the action is barred by parental immunity. In light of the procedural posture of this case, we are not prepared at this time to determine whether the plaintiffs' action is completely barred by the doctrine of parental immunity. Some of the allegations in the amended complaint arguably fall within the scope of the immunity recognized by *Cates* and further limited by the special circumstances like those in which the state acknowledges the defense would not be available, as noted above. Other allegations, however, perhaps fall outside those boundaries. The plaintiffs should have an opportunity to amend their complaint further to allege additional matters that, if true, could defeat a claim of parental immunity in the foster family context.

"If a cause of action is dismissed during hearing on a section 2—619 motion on the pleadings and affidavits, the question on appeal is whether there is a genuine issue of material fact and whether defendant is entitled to judgment as a matter of law. [Citations.]" *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 494 (1994). On the present record, we believe that there remains a genuine issue of material fact concerning the Stasses' parental immunity defense. The defendants did not raise this particular theory in the circuit court. Although that omission does not preclude them from now arguing the theory as an alternative ground in support of the ruling below (*Wright v. City of Danville*, 174 Ill. 2d 391, 399 (1996)), it does mean that the issues on this point were not shaped as they ordinarily would have been through the adversary process. We therefore believe that the plaintiff should be entitled to plead anew.

For the reasons stated, the judgments of the appel-

late and circuit courts are reversed, and the cause is remanded to the circuit court for further proceedings.

*Judgments reversed;*
*cause remanded.*

JUSTICE HEIPLE, dissenting:

Two-year-old Jonathan Nichol drowned in a bathroom toilet while in the care of his foster parents, John and Bonnie Stass. Jonathan's biological parents filed a complaint against the Stasses alleging negligent supervision, monitoring and care of Jonathan. The majority correctly holds that foster parents are not employees or agents of the state and therefore the Stasses cannot invoke sovereign immunity as a defense to plaintiffs' claims. Regrettably, however, the majority also holds that foster parents enjoy a limited but undefined form of parental immunity which apparently bars some but not all of plaintiffs' claims against the Stasses. I disagree. There are fundamental differences in the relationship between foster parents and foster children and the relationship between a child and his actual parents which preclude extending parental immunity to foster parents. Additionally, the majority provides virtually no guidance to lower courts regarding the extent and scope of such immunity because the majority declines to hold whether or not parental immunity bars plaintiffs' claims against the Stasses. Therefore, I respectfully dissent.

The majority's holding that foster parents enjoy a limited form of parental immunity is based on the assumption that foster parents perform essentially the same functions as actual parents and therefore it would be anomalous to extend immunity to actual parents but not to foster parents. 192 Ill. 2d at 246. Again, I disagree. Fundamental differences between a foster parent and an actual parent's relationship with a child militate against extending parental immunity to foster parents. A foster parent is not related to a foster child by blood or adop-

tion. The relationship between a foster parent and a foster child is created exclusively by contract. 192 Ill. 2d at 241 (referring to foster parents as "independent contractors"). Foster parents, unlike biological or adoptive parents, receive reimbursement for expenses related to the care of the foster child. 89 Ill. Adm. Code §§ 353.5, 359.4 (1996); 20 ILCS 520/1—15(4) (West 1996) (foster parents have "right to receive timely financial reimbursement commensurate with the care needs of the [foster] child"). Moreover, a foster parent's relationship with a foster child is purposely designed to be temporary. When a child is placed in foster care, the state's paramount goal remains to reunite the child with his biological parents. 89 Ill. Adm. Code §§ 305.40(b)(2)(a), 315.45(b) (1996). See *Johnson v. Burnett*, 182 Ill. App. 3d 574, 582 (1989) (foster parents serve as "a temporary way station on the road of a child's life until the difficulties at home can be straightened out"). A foster parent is a "professional member of the child welfare team" (20 ILCS 520/1—15(1) (West 1996)), not a foster child's permanent family member and caregiver. The licensing of foster parents, the placement of foster children and the relationship between foster parents and foster children are all extensively regulated by the state. Since foster parents voluntarily assume a contractual duty to provide care and supervision for foster children, they should not be immunized for failure to use reasonable care in the performance of their duties. *Mayberry v. Pryor*, 422 Mich. 579, 586-87, 374 N.W.2d 683, 686 (1985) (holding parental immunity does not bar negligent supervision claim against foster parents); *Andrews v. Otsego County*, 112 Misc. 2d 37, ___, 446 N.Y.S.2d 169, 172-74 (1982) (same); *Goller v. White*, 20 Wis. 2d 402, 122 N.W.2d 193 (1963) (same).

The majority states that the primary policy justification for parental immunity—preservation of parental

authority and discipline—also applies to foster parents. The extensive regulations governing foster parents' ability to discipline foster children, however, demonstrate that this justification is not viable when applied to foster parents. Foster parents cannot decide for themselves how to discipline foster children; their authority to discipline foster children is strictly circumscribed by regulation. *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510, 518 (1997) (Cook, J., dissenting). Foster parents, for example, cannot subject foster children to corporal punishment (89 Ill. Adm. Code § 402.21(c) (1996)), but they are permitted to assign special or additional chores as a disciplinary measure (89 Ill. Adm. Code § 402.21(j) (1996)). Foster parents cannot deprive a foster child of a meal or part of a meal as punishment. 89 Ill. Adm. Code § 402.21(d) (1996). Foster parents are permitted to restrict a foster child to his bedroom as punishment, but the bedroom must be unlocked, the foster child can only be confined for a "reasonable" amount of time, and he must be given full access to the bathroom. 89 Ill. Adm. Code § 402.21(g) (1996). Foster parents are permitted to withhold a foster child's monthly personal spending money for breaking family rules, but only if the child has been given an oral warning. 89 Ill. Adm. Code § 402.21(i)(1)(b) (1996). The State even regulates how much of the foster child's spending money (50%) that the foster parent can withhold for disciplinary reasons. 89 Ill. Adm. Code § 402.21(i) (1996). The state places no such restrictions on the authority of biological or adoptive parents to discipline their children.

The majority asserts that " '[e]xposure to suit for negligence in supervising and disciplining the children in their custody would be a deterrent to the best performance by the foster parents in this regard.' " 192 Ill. 2d at 245, quoting *Commerce Bank v. Augsburger*, 288 Ill. App. 3d 510, 517 (1997). I have no idea what this means.

In any event, the majority has it exactly backwards. Immunizing foster parents from liability eliminates a powerful incentive for ensuring that foster parents adequately perform the duties for which they were hired. The majority's rationale, whatever it means, has little relevance to this case. The Stasses have no more duties to perform as foster parents; they no longer care for Jonathan Nichol. He is dead.

The majority gives great weight to the interest of preserving foster parents' authority to discipline foster children, but the majority fails to consider the foster child's interest in receiving proper care and, if so indicated, compensation for his injuries. Granting parental immunity to the foster parents in this case has the perverse effect of protecting conduct which plaintiffs allege is responsible for severing the only permanent family relationship Jonathan Nichol had, his relationship with his biological parents.

Finally, the majority's failure to hold whether plaintiffs' claims are barred is inexcusable. The majority states:

> "Some of the allegations in the amended complaint arguably fall within the scope of the immunity recognized by *Cates* and further limited by the special circumstances like those in which the state acknowledges the defense would- not be available, as noted above. Other allegations, however, perhaps fall outside those boundaries. The plaintiffs should have an opportunity to amend their complaint further to allege additional matters that, if true, could defeat a claim of parental immunity in the foster family context ." 192 Ill. 2d at 248.

The majority justifies its bizarre refusal to determine whether plaintiffs' claims are barred under the doctrine of parental immunity by stating that "there remains a genuine issue of material fact concerning the Stasses' parental immunity defense." 192 Ill. 2d at 248. Yet, inexplicably, the majority never identifies what this genuine issue of material fact is. This, however, is not the

only thing missing from the majority opinion. There is no resolution or conclusion in the majority opinion. It winds down to nothing more than an advisory opinion that foster parents should have a limited form of parental immunity. A cryptic statement that some of plaintiffs' claims are barred and some are not is useless to the parties in this case and provides no guidance to either litigants, lawyers or judges who may be faced with this same issue. The majority remands to the circuit court so that plaintiffs can replead, but this disposition is absolutely useless if this court fails to identify with any certainty which claims are barred by the undefined form of parental immunity which the court now extends to foster parents.

Accordingly, I respectfully dissent.

JUSTICE FREEMAN, also dissenting:

The court today resolves the critical question of subject matter jurisdiction on the basis of an incomplete record on appeal. The court today also concludes that the state does not have a nondelegable duty to provide for the care of children placed in foster homes. Rather, the state's duty is merely to "provide placement, to institute procedures, *** [and] to exercise general authority over foster children." 192 Ill. 2d at 243. Lastly, the court today holds that foster parents stand *in loco parentis* to their foster children and, with certain exceptions, are entitled to the same protection from lawsuits enjoyed by biological parents and teachers. I respectfully dissent.

Jonathan Nichol died in the care of his foster parents, John and Bonnie Stass. Jonathan's biological parents, Gregory and Ruby Nichol, individually and as administrators of Jonathan's estate, brought an action in the circuit court of Cook County against the Stasses and the Human Enrichment and Developmental Association (HEDA), a child welfare agency supervising the Stasses. In the complaint, the Nichols alleged, *inter alia*, that the

Stasses failed to supervise Jonathan, to protect him from hazards in the foster home, and to provide him with immediate medical care. The Nichols alleged, *inter alia*, that HEDA negligently failed to supervise the Stasses, and failed to place Jonathan in a home "free from observable hazards."

The Stasses filed a motion to dismiss the complaint pursuant to sections 2—619(a)(1) and (a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(1), (a)(9) (West 1998)). They maintained that an action against a foster parent is an action against the state, and, as such, must be filed in the Illinois Court of Claims. See 705 ILCS 505/8 (West 1998). The circuit court agreed. The court followed *Griffin v. Fluellen*, 283 Ill. App. 3d 1078 (1996), which held that a claim against a foster parent appointed by the Department of Children and Family Services is in actuality a claim against the state, and must be filed in the court of claims. The circuit court concluded that the court of claims had exclusive subject matter jurisdiction over the Nichols' claim. The Nichols appealed.

The appellate court affirmed the circuit court's order of dismissal. The appellate court held that foster parents are agents of the state because they are appointed by the Department of Children and Family Services (DCFS), a state agency, and they are performing duties statutorily mandated as government duties. Furthermore, whether foster parents are agents of the state or independent contractors, they perform the state's nondelegable duties toward its foster wards. Thus, the conduct of the foster parent is the conduct of the state, and the foster parent is considered an agent of the state whether or not he is in fact an independent contractor. The appellate court ruled that, in the performance of their duties as foster parents, the Stasses were agents of the state, and, as such, could be sued only in the court of claims. The Nichols sought and received leave to appeal to this court.

In this court, the Nichols maintain that the Stasses

are neither agents nor employees of the state and, therefore, the circuit court erred in dismissing the complaint for lack of subject matter jurisdiction. Contrarily, the Stasses contend that the court of claims has exclusive jurisdiction over the Nichols' claim, as it does over all claims brought against the state. Thus, the question on appeal is whether the Stasses are agents or employees of the state, protected by the doctrine of sovereign immunity. If a foster parent is neither an agent nor an employee of the state, the circuit court erred in dismissing the complaint for lack of subject matter jurisdiction. If a foster parent is an agent or employee of the state, and the claim against the Stasses is in fact a claim against the state, the circuit court did not err in dismissing the complaint for lack of subject matter jurisdiction. See *Healy v. Vaupel*, 133 Ill. 2d 295 (1990) (discussing when an· action nominally against a servant or agent of the state is actually an action against the state). The subject matter jurisdiction of the circuit court, and consequently of this court, turns on the question of state agency or employment.

To begin its analysis, the majority notes that the Foster Parent Law (20 ILCS 520/1—10, 1—15, 1—20 (West 1998)) "does not describe foster parents as either employees or agents" of the state. 192 Ill. 2d at 238. The majority then examines "a variety of statutes relating to state employment," and concludes that foster parents are not "deemed state employees" in these statutes. 192 Ill. 2d at 238.

It would seem that the next logical step for the majority would be to determine that foster parents are not agents or employees of the state. Instead, the majority looks to the contents of the record on appeal to determine subject matter jurisdiction. The majority notes:

"The record in the present case is not entirely clear concerning the relationship among the Stasses, HEDA, and the Department of Children and Family Services. Accord-

ing to the allegations in the complaint, HEDA, an independent child welfare organization, was 'in charge of, supervisor of, manager of, and director of' the Stasses as foster parents. Neither side appended to any of their pleadings copies of the contracts between the Department and HEDA and between HEDA and the Stasses. To be sure, it was the [Stasses'] motion to dismiss, and therefore it was their duty to supply a record in support of their motion." 192 Ill. 2d at 239.

Because the record on appeal is incomplete, the majority assumes that the Stasses are not agents or employees of the state. From this assumption flows another: the circuit court had subject matter jurisdiction because the claim against the Stasses is not a claim against the state. Thus, the contents of the record on appeal determine subject matter jurisdiction.

Given the importance of subject matter jurisdiction, I question the propriety of deciding the issue in such a speculative manner. If the majority believes that state agency or employment is to be determined on the basis of the record on appeal, why not defer the question until the record is complete? Why not remand to the circuit court so the Stasses can supplement the record? Once the record is complete, this court could give full consideration to the issue of state agency or employment. The majority identifies correctly the threshold question on appeal: "whether the [Stasses] are in fact state employees or agents." 192 Ill. 2d at 238. However, the majority never answers the "threshold question" so identified.

I believe it was neither necessary nor proper to refer to the record on appeal to determine the question of state agency or employment. Whether foster parents are agents or employees of the state depends on the statutory framework under which they operate, the administrative regulations with which they must comply, and the duties they are required to perform. Do foster parents perform services for the state? Are foster parents reimbursed by the state for expenses related to the care

of the foster child? Does the state dictate the manner in which foster parents perform their work? Are their actions controlled by the state or subject to the state's right of control? Based upon my review of the statutory framework created by our General Assembly and the regulations promulgated by DCFS these questions must be answered in the affirmative. Consequently, I am of the opinion that foster parents are agents of the state.

In the case at bar, the Stasses were under the supervision of HEDA, a child welfare agency. Nonetheless, they were subject to control by the state, as I will demonstrate below. All foster parents, whether supervised directly by DCFS or supervised by a child welfare agency, are subject to DCFS licensing requirements, must participate in DCFS training programs, must maintain records required by DCFS, must provide access to DCFS, and must comply with DCFS standards relating to the appearance, cleanliness and safety of the facility; the discipline of children at the facility; and the provision of care to children at the facility.

There can be no doubt that foster parents perform services for the state. DCFS "is a legislatively created agency charged with the duty to protect and promote the welfare of the children of Illinois." *In re C.J.*, 166 Ill. 2d 264, 269-70 (1995). DCFS is empowered to provide child welfare services aimed at protecting and promoting the health, safety and welfare of children; assuring safe and adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption; and restoring to their families children who have been removed, by providing services to the child and the families when the child can be cared for at home without endangering the child's health and safety. 20 ILCS 505/5(a)(3) (West 1998). DCFS relies upon

foster homes and child welfare agencies[1] to provide substitute care for children away from home. Our legislature best describes the role of foster parents:

"Family foster care is an essential service for children and their families who have been separated due to the tragedy of child abuse, neglect, or dependency. When children have been separated from their families, it is the responsibility of the child welfare team to respond to the needs of the children and their families ***.

Foster parents are an essential part of and fulfill an integral role on the child welfare team ***. By providing care for children and supporting the attachment of children to their families in a manner sensitive to each child's and family's unique needs, the foster parent serves the child, the family, and the community." 20 ILCS 520/1—5 (West 1998).

There can be no doubt foster parents are entitled to reimbursement from the state for the services they provide to foster children. A foster parent's rights include "[t]he right to receive timely financial reimbursement commensurate with the care needs of the child." 20 ILCS 520/1—15(4) (West 1998). DCFS is required to disburse monies to the foster parent for the child's care (89 Ill. Adm. Code § 353.5(a) (1996)), including payments for room, board, clothing, and a personal allowance to the child (89 Ill. Adm. Code § 353.2 (1996)). DCFS also provides payment for goods and services necessary to ensure the personal and physical maintenance of placed children, including payments for cultural enrichment,

---

[1]A child welfare agency is a "public or private child care facility, receiving any child or children for the purpose of placing or arranging for the placement of the child or children in foster family homes or other facilities for child care, apart from the custody of the child's or children's parents. The term 'child welfare agency' includes all agencies established and maintained by a municipality or other political subdivision of the State of Illinois to protect, guard, train or care for children outside their own homes." 225 ILCS 10/2.08 (West 1998).

education expenses, camp fees, clothing, and supplies. 89 Ill. Adm. Code § 359.7 (1996).

Lastly, there can be no doubt that foster parents' actions are controlled by the state or subject to the state's right of control. Virtually all aspects of foster care are dictated by the state. Facilities for child care or child care facilities[2] are licensed by the state. Application for a license to operate a child care facility must be made to DCFS in the manner and on forms prescribed by it. 225 ILCS 10/4 (West 1996). The application must include written authorization by the applicant and all adult members of the applicant's household to conduct a criminal background investigation; medical evidence in the form of a medical report that the applicant and all members of the household are free from communicable diseases or physical and mental conditions that affect their ability to provide care for the child or children; the names and addresses of at least three persons who can attest to the applicant's moral character; and fingerprints submitted by the applicant and all adult members of the applicant's household. 225 ILCS 10/4(b) (West 1998). DCFS issues a license to a child care facility if, upon examination of the facility and investigation of persons

---

[2]Facility for child care or child care facility means "any person, group of persons, agency, association or organization, whether established for gain or otherwise, who or which receives or arranges for care or placement of one or more children, unrelated to the operator of the facility, apart from the parents, with or without the transfer of the right of custody in any facility *** established and maintained for the care of children." 225 ILCS 10/2.05 (West 1998).

A foster family home is "a facility for child care in residences of families who receive no more than 8 children unrelated to them, unless all the children are of common parentage, or residences of relatives who receive no more than 8 related children placed by [DCFS], unless the children are of common parentage, for the purpose of providing family care and training for the children on a full-time basis." 225 ILCS 10/2.17 (West 1998).

responsible for care of the children, DCFS is satisfied that the facility and responsible persons meet standards prescribed for the facility. 225 ILCS 10/4(d) (West 1998). The license remains valid for four years, unless revoked by DCFS. 225 ILCS 10/5(d) (West 1998).

DCFS is required to prescribe and publish minimum standards for licensing child care facilities, which include foster family homes. 225 ILCS 10/7 (West 1998). The standards must touch upon the character, suitability and qualifications of an applicant and other persons directly responsible for the care and welfare of the children served; the number of individuals or staff required to insure adequate supervision and care of the children; the operation and conduct of the facility and responsibility it assumes for child care; the appropriateness, safety, cleanliness and general adequacy of the premises, including maintenance of adequate fire prevention and health standards conforming to state laws and municipal codes; the maintenance of records pertaining to the admission, progress, health and discharge of children; the filing of reports with DCFS; the discipline of children; and the provisions for food, clothing, educational opportunities, program, equipment and individual supplies to assure the healthy physical, mental and spiritual development of the children served. 225 ILCS 10/7(a) (West 1998). Each licensee is required to post a complete and current set of the licensing standards in a common area so that all employees of the facility may have unrestricted access to the standards, and maintain documentation of the current review of licensing standards by all employees. 225 ILCS 10/7(a) (West 1998). Lastly, foster parents are also required to undergo training with DCFS. DCFS standards provide that "[f]oster parents shall complete, as a condition of initial licensure, at least six clock hours of training on content approved by [DCFS]." 89 Ill. Adm. Code § 402.12(i) (1996).

DCFS's control over the child care facility extends beyond the initial licensing of the facility. DCFS may revoke a child care facility's license, and issue a conditional license to the facility. 225 ILCS 10/8.2 (West 1998). The conditional license, issued for no more than six months, affords the child care facility time to correct deficiencies or meet licensing standards. 225 ILCS 10/8.2 (West 1998). A complete listing of deficiencies and a corrective plan approved by DCFS must exist at the time a conditional license is issued. 225 ILCS 10/8.2 (West 1998).

DCFS may revoke or refuse to renew the license of a child care facility if the licensee fails or refuses to admit authorized representatives of DCFS at any reasonable time for the purpose of investigation; fails to maintain the standards prescribed and published by DCFS; fails to provide, maintain, equip and keep in safe and sanitary conditions premises established or used for child care as required under standards prescribed by DCFS, or as required by any law, regulation or ordinance applicable to the facility; fails to correct any condition which jeopardizes the health, safety, morals, or welfare of children served by the facility; fails to exercise reasonable care in the hiring, training and supervision of facility personnel; or fails to discharge or sever affiliation with the child care facility of an employee or volunteer at the facility with direct contact with children who is the subject of an indicated report under section 3 of the Abused and Neglected Child Reporting Act (325 ILCS 5/3 (West 1998)). 225 ILCS 10/8, 8.1 (West 1998).

DCFS also controls the placement of children in child care facilities (20 ILCS 505/7 (West 1998)), family-child visitation (89 Ill. Adm. Code § 301.210 (1996)), and sibling visitation (89 Ill. Adm. Code § 301.220 (1996)). In making a placement, DCFS must ensure that the child's health, safety, and best interests are met. 20 ILCS 505/7(c) (West 1998). DCFS is required to develop a case plan

designed to reunify the child with his family when safe and appropriate, or to move the child toward the most permanent living arrangement possible. 20 ILCS 505/6a (West 1998). The foster parent is a member of the child welfare team, and champions the efforts of the team by providing care to the child and supporting the attachment of the child to his family in a manner sensitive to the child's and family's unique needs. 20 ILCS 520/1—5 (West 1998).

Beyond the development of an overall case plan for each child, DCFS delves into the everyday aspects of care provided to the child. DCFS publishes standards relating to sleeping arrangements for the foster child (89 Ill. Adm. Code §§ 402.9(a), (b), (c) (1996)); sharing a bedroom (89 Ill. Adm. Code §§ 402.9(c), (d), (e) (1996)); the size of the bedroom and ventilation (89 Ill. Adm. Code §§ 402.9(g), (h) (1996)); the springs and mattresses on the bed, and mattress covers (89 Ill. Adm. Code §§ 402.9(i), (k) (1996)); linen changes (89 Ill. Adm. Code § 402.9(j) (1996)); the bedroom furnishings (89 Ill. Adm. Code § 402.9(l) (1996)); the number of meals and time span between meals (89 Ill. Adm. Code § 402.10(a) (1996)); special diets (89 Ill. Adm. Code § 402.10(c) (1996)); the nutritional needs of the child (89 Ill. Adm. Code § 402.10(d) (1996)); the manner in which meals are served and sanitary conditions (89 Ill. Adm. Code § 402.10(f) (1996)); coerced feeding (89 Ill. Adm. Code § 402.10(g) (1996)); child assistance in meal preparation (89 Ill. Adm. Code § 402.10(h) (1996)); the use of food products from home-raised animals (89 Ill. Adm. Code § 402.10(b) (1996)); medical and dental checkups (89 Ill. Adm. Code § 402.17(a) (1996)); immunizations and tests (89 Ill. Adm. Code § 402.17(c) (1996)); the use of prescription drugs or medicines (89 Ill. Adm. Code § 402.17(e) (1996)); contagious diseases (89 Ill. Adm. Code § 402.17(g) (1996)); recreation and leisure time (89 Ill. Adm. Code § 402.19 (1996)); develop-

ment of social relationships through participation in schools, and other community and group activities (89 Ill. Adm. Code § 402.16(c) (1996)); participation in extracurricular activities including sports, art and music (89 Ill. Adm. Code § 402.20(b) (1996)); cooperation in the child's educational plan (89 Ill. Adm. Code § 402.20(a) (1996)); contact with educators (89 Ill. Adm. Code § 402.20(c) (1996)); corporal punishment, verbal abuse, threats or derogatory remarks (89 Ill. Adm. Code § 402.21(c) (1996)); meal deprivation (89 Ill. Adm. Code § 402.21(d) (1996)); deprivation of visits with family or other persons (89 Ill. Adm. Code § 402.21(e) (1996)); clothing or sleep deprivation (89 Ill. Adm. Code § 402.21(f) (1996)); restriction to a room (89 Ill. Adm. Code § 402.21(g) (1996)); use of physical restraints (89 Ill. Adm. Code § 402.21(h) (1996)); withholding child's spending money for disciplinary purposes (89 Ill. Adm. Code § 402.21(i) (1996)); special or additional chores as disciplinary measure (89 Ill. Adm. Code § 402.21(j) (1996)); removal of privileges as disciplinary measure (89 Ill. Adm. Code § 402.21(k) (1996)); inviting friends to the foster home or visiting in the homes of friends (89 Ill. Adm. Code § 402.16(c) (1996)); overnight stays with friends or relatives of the child or foster parents (89 Ill. Adm. Code § 402.16(d) (1996)); personal allowance money and earning additional spending money (89 Ill. Adm. Code § 402.16(e) (1996)); opportunity for the child to assume some responsibility for himself and for household duties (89 Ill. Adm. Code § 402.16(g) (1996)); equitable treatment of all children in the foster family (89 Ill. Adm. Code § 402.16(a) (1996)); and supervision of the child (89 Ill. Adm. Code § 402.16(b) (1996)).

DCFS also publishes standards relating to the number and ages of children served in a child care facility (89 Ill. Adm. Code § 402.15 (1996)); the health of the foster parents and members of the household (89 Ill.

Adm. Code § 402.14 (1996)); qualifications of the foster family, including financial resources which must be available to the foster family (89 Ill. Adm. Code § 402.12 (1996)); the operation of other business enterprises in the child care facility (89 Ill. Adm. Code § 402.11(c) (1996)); employment of foster parents outside the home (89 Ill. Adm. Code § 402.11(d) (1996)); the operation of a rooming or boarding house on the premises (89 Ill. Adm. Code § 402.11(a) (1996)); and general requirements for the child care facility (89 Ill. Adm. Code § 402.8 (1996)). The general requirements for the foster home concern such matters as the water supply of the foster home; the use of portable space heaters; fire and emergency evacuation plans; closet and dresser space for the foster child; the availability of a telephone; storage of drugs, household supplies, dangerous tools, weapons, guns and ammunition; household pets; the child's right to privacy while sleeping, washing and dressing; and ventilation, lighting and cleanliness of the home. 89 Ill. Adm. Code § 402.8 (1996). Lastly, foster parents are required to maintain certain records for each child, including a record of immunizations, a daily log of medication prescribed and given, and a record of arrangements for the child's education. 89 Ill. Adm. Code § 402.26 (1996).

DCFS exercises pervasive control over foster parents, such as the Stasses. The right to control the actions of another is a hallmark of agency. Restatement (Second) of Agency § 1, at 7 (1958); see also *Taylor v. Kohli*, 162 Ill. 2d 91, 95-96 (1994) (the principal factor to consider in determining whether a relationship is that of principal/ agent, employer/employee or owner/independent contractor is the right to control the manner in which the work is done); *Hansen v. Caring Professionals, Inc.*, 286 Ill. App. 3d 797, 801 (1997). In light of the fact that foster parents perform services for the state, receive reimbursement from the state, and are subject to the state's control

in all aspects of the provision of care to children at the facility, foster parents must be considered agents of the state.

An equally important reason to hold that foster parents are agents of the state is that foster parents perform the state's nondelegable duty to provide for the care of its wards. By statute, DCFS is required to provide child welfare services aimed at protecting and promoting the health, safety and welfare of children; assuring safe and adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption; and restoring to their families children who have been removed, by providing services to the child and the family when the child can be cared for at home without endangering the child's health and safety. 20 ILCS 505/5(a)(3) (West 1998). Further, DCFS is required to "establish rules and regulations concerning its operation of programs designed to meet the goals of child safety and protection, family preservation, family reunification." 20 ILCS 505/5(g) (West 1998). A decision to place a child in foster care is to be made "with considerations of the child's health, safety, and best interests." 20 ILCS 505/5(1—1) (West 1996).

As noted in the Restatement (Second) of Torts, "[o]ne who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions." Restatement (Second) of Torts § 424, at 411 (1965). This is so because the statutory duty is nondelegable, and the principal is not relieved of liability by hiring an independent contractor to perform his duty. The independent contractor is deemed the agent of the principal. Stated in other words, "[a] master or other principal who is under a duty to

provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty." Restatement (Second) of Agency § 214, at 463 (1958). The Restatement elaborates:

"[O]ne may have a duty to see that due care is used in the protection of another, a duty which is not satisfied by using care to delegate its performance to another but is satisfied if, and only if, the person to whom the work of protection is delegated is careful in giving the protection. In this *** class, the duty of care is non-delegable." Restatement (Second) of Agency § 214, Comment *a*, at 464 (1958).

In the case at bar, the state had a duty to provide care to Jonathan Nichol. The state attempted to fulfill this duty by placing Jonathan in the home of the Stasses, where he died. The Stasses should be deemed agents of the state, and the state should be vicariously liable for the actions of the Stasses. The state could not relieve itself of liability by entrusting the performance of its duty to the Stasses.

The majority here states:

"[W]hatever duty there is to provide placement, to institute procedures, or even to exercise general authority over foster children is not the same as a continuing, nondelegable duty to provide for the care of children placed in foster homes." 192 Ill. 2d at 243.

I disagree. The majority's analysis of this issue trivializes the duty imposed upon the state. In his dissent in *Lipscomb v. Simmons*, 962 F.2d 1374, 1385-86 (9th Cir. 1992) (Kozinski, J., dissenting), Judge Kozinski summarized the relationship between the foster child and the state:

"In removing children from the custody of parents who are unable, unwilling or unfit to take care of them, the state performs a very significant—and very delicate— governmental function. Because children normally have no resources of their own, and very young children lack the

wherewithal to provide for their own upkeep, they depend on adults for the necessities of life and for the other resources they need to become healthy, productive and well-adjusted adults. [Citations.] Normally these resources are provided by their parents; every child has a legitimate expectation, if not entitlement, to be supported by the adults who brought him into the world. But when, because of death or disability, criminality or drug abuse, the child's parents fail to provide these resources, the state normally steps in to make sure the child receives the necessary care. Indeed, every state in the union has undertaken to care for its abandoned, neglected and mistreated children. In so doing, states take on very significant responsibilities.

The process starts with removing the child from the custody and control of those to whom he is entitled to look for support and nurture. 'When the minor must be removed from the custody of his parents for his own welfare ... the state assum[es] the parents' role... .' [Citations.] The weighty and sensitive responsibilities of parenthood—with its focus on the well-being of the child—devolve upon the state."

The state does not merely have a "duty to provide placement, to institute procedures, or even to provide general authority over foster children." The state has a duty to care for its wards.

Far from trivial, the state's duty to its wards is of constitutional proportions. Several courts have held, by analogy to *Estelle v. Gamble*, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976), and *Youngberg v. Romeo*, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982), that a state may be liable under the due process clause for failing to protect children in foster homes from mistreatment by foster parents. See *Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895 (7th Cir. 1997); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987); *Doe v. New York City Department of Social Services*, 649 F.2d 134 (2d Cir. 1981); *Taahira W. ex rel. McCord-Salley v. Travis*, 908 F. Supp. 533 (N.D. Ill. 1995); *B.H. v. Johnson*,

715 F. Supp. 1387 (N.D. Ill. 1989). See also *Camp v. Gregory*, 67 F.3d 1286 (7th Cir. 1995).

I do not wish to imply that foster parents, in general, are bad persons. The vast majority of foster parents are persons of good nature, who undertake a difficult task and do so to the best of their abilities. I approach this issue from the point of view that the state has a nondelegable duty to care for its wards. Foster parents are agents of the state. To the extent that certain foster parents, like persons in the general population, are unqualified to provide care to foster children, or do not possess the temperament or qualities needed to serve as foster parents, the state must be held liable for harm suffered by the state's wards while in the care of these foster parents.

The state had a nondelegable duty to care for Jonathan, whether the duty is said to be statutory or constitutional. The state could not avoid liability by delegating this duty to the Stasses. As a consequence, I believe that the Nichols' action should have been brought against the state in the Court of Claims. I also believe this court does not have jurisdiction over this action, as subject matter jurisdiction lies in the Court of Claims.

Having assumed that the Stasses are not state agents or employees, the majority next considers whether the doctrine of parental immunity bars an action against a foster parent for negligence. To begin its analysis, the majority explains the rationale justifying the doctrine of parental immunity—preservation of parental authority and discipline. 192 Ill. 2d at 244. The majority then compares the roles of biological parents, foster parents and teachers. The majority acknowledges that "the relationship between foster parents and foster children is not identical with the relationship between biological parents and their children." 192 Ill. 2d at 244-45. The relationship between a foster parent and foster child "is

not permanent and may even be relatively brief." 192 Ill. 2d at 246. Also, foster parents "receive compensation for their work." 192 Ill. 2d at 245. However, the majority concludes that foster parents stand *in loco parentis* to their foster children and, with certain exceptions, are entitled to the same protection from lawsuits enjoyed by biological parents and teachers.[3] The majority explains:

"[F]oster parents, like teachers and biological parents, are responsible for a broad range of decisions affecting the vital interests of the children involved. It would be anomalous to grant a qualified immunity to educators and biological parents but to deny immunity entirely to foster parents, who, in their relationship with their foster children, share many important similarities with the others. Thus, it can be seen that our result in this case does not represent an undue expansion of the immunity doctrine; rather, our holding is entirely consistent with this court's previous decisions recognizing immunity for persons who stand *in loco parentis* to children." 192 Ill. 2d at 246.

Again, I disagree.

Like Justice Heiple, I believe that there are fundamental differences in the relationship between a foster parent and foster child and the relationship between a biological parent and child which militate against extension of parental immunity to foster parents. Foster parents do not stand *in loco parentis* to foster children. Thus, I join in Justice Heiple's dissent on this issue. However, I write separately to sound a cautionary note: the majority has redefined the term *in loco parentis*, and its opinion may have unintended consequences.

Prior case law established that one who stands *in*

---

[3]The majority imposes certain restrictions on the immunity afforded foster parents. Thus, parental immunity is not available when "the underlying conduct result[s] in the revocation of a foster parent's license or a finding of neglect, or when it is the subject of a criminal charge." 192 Ill. 2d at 247. Further, the immunity does not override DCFS regulations to the contrary. 192 Ill. 2d at 247.

*loco parentis* is one who "take[s] upon himself the obligations of a parent." *Busillo v. Hetzel*, 58 Ill. App. 3d 682, 684 (1978); accord *People ex rel. Smilga v. Hoyer*, 345 Ill. App. 365, 368 (1952). As explained in *Smilga*,

> " ' "a person *in loco parentis*, means a person taking upon himself the duty of a father to make provision for the child." [Citation].' The cases dealing with this subject emphasize the fact that one standing *in loco parentis* assumes the financial burdens arising out of the relationship of parent and child." *Smilga*, 345 Ill. App. at 369, quoting *Capek v. Kropik*, 129 Ill. 509, 515 (1889).

Thus, in *Mid-American Lines, Inc. v. Industrial Comm'n*, 82 Ill. 2d 47, 52 (1980), this court stated, "[a] showing of *in loco parentis* \*\*\* has come to require that the putative parent (1) intended to assume parental functions and (2) discharged parental duties." "Mere affection, generosity, and exercise of care without assuming the usual financial burdens of parenthood are insufficient to place one *in loco parentis* to a child." *Busillo*, 58 Ill. App. 3d at 684, citing *Hawkey v. United States*, 108 F. Supp. 941 (E.D. Ill. 1952).

In *Wallace v. Smyth*, 301 Ill. App. 3d 75 (1998), our appellate court considered whether a not-for-profit academy, the director of the academy, and counselors employed by the academy (collectively defendants) stood *in loco parentis* to a child. DCFS had placed the child with the academy for a 90-day diagnostic assessment. The child lived in the home of the director of the academy, and died while being restrained by the director and two counselors. The child's biological parent filed an action alleging that defendants acted negligently, willfully, and wantonly in the death of the child. The trial court granted defendants' motion to dismiss the negligence claim on the basis of parental immunity. On appeal, the court observed that "parties must assume the usual financial burdens of parenthood before they can be considered *in loco parentis*, and such status is granted

sparingly." *Wallace*, 301 Ill. App. 3d at 79. The court observed further:

"The relevant legislation here is the Illinois Administrative Code, which states DCFS has legal and financial responsibility for children of whom it is guardian, regardless of their momentary location. That obligation entails providing for such children's clothing, mental health care, camp fees and supplies, cultural enrichment, educational expenses, and medical care." *Wallace*, 301 Ill. App. 3d at 80-81.

The court found that DCFS, and not defendants, bore ultimate responsibility for traditional parental functions with regard to the child. Thus, the action against defendants was not barred by the doctrine of parental immunity. See also *Bland v. Department of Children & Family Services*, 141 Ill. App. 3d 818, 822 (1986) (DCFS was the party *in loco parentis* to the child; the grandparents did not enjoy the right, nor were they burdened by the obligations of parents.)

As noted in Justice Heiple's dissent, foster parents receive reimbursement for expenses related to the care of the foster child. 192 Ill. 2d at 250 (Heiple, J., dissenting). Although foster parents provide housing and care to the foster child, foster parents have the "right to receive timely financial reimbursement commensurate with the care needs of the [foster] child." 20 ILCS 520/1—15(4) (West 1998). Under established law, a person who exercises "the parental attributes of affection, generosity, and care without assuming the usual financial burdens of parenthood does not stand *in loco parentis* to a child." *Lawber v. Doil*, 191 Ill. App. 3d 323, 325 (1989). Consequently, a foster parent does not stand *in loco parentis* to the foster child.

The majority concedes that foster parents do not assume the financial burdens of parenthood. See 192 Ill. 2d at 246. However, citing *Kobylanski v. Chicago Board of Education*, 63 Ill. 2d 165 (1976), the majority notes this

court has held that teachers stand *in loco parentis* to a student, although teachers are compensated for their work. 192 Ill. 2d at 246. Sections 24—24 and 34—84a of the School Code (105 ILCS 5/24—24, 34—84a (West 1998)), which were in effect at the time this court decided *Kobylanski* (see Ill. Rev. Stat. 1967, ch. 122, pars. 24—24, 34—84a), provide that "[i]n all matters relating to the discipline in and conduct of the schools and the school children, [teachers] stand in the relation of parents and guardians to the pupils." Thus, it is by legislative enactment that a teacher stands *in loco parentis* to a student. The legislature has not seen fit to include a similar provision in the statutes relating to foster parents.

By its holding today, the majority has eliminated the requirement that one who stands *in loco parentis* must assume financial responsibility for the child. The majority has redefined the term *in loco parentis*. The implication in the present case is that the Stasses may invoke the doctrine of parental immunity to bar an action for negligent supervision of Jonathan Nichol. The majority opinion, however, may have unintended consequences. As noted by the appellate court in *Wallace*, 301 Ill. App. 3d at 80, housing, care and education are also provided by summer camps, day-care centers, medical and psychological treatment facilities, grandparents and other relatives of a child. Do these persons or entities also stand *in loco parentis* to a child? Should the *Wallace* court have held that the academy and counselors stood *in loco parentis* to the child placed in their care? Moreover, use of the term *in loco parentis* is not restricted to the area of foster care or education. Under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1998)) death benefits are payable to a child to whom the deceased employee stood *in loco parentis*. A parent, or one who stands *in loco parentis* to a child may be guilty of the offense of contributing to the dependency or neglect of the child.

720 ILCS 130/2 (West 1998). By redefining the term *in loco parentis*, the majority opinion may have an impact on diverse areas of the law.

In this case, we must, as a threshold matter, determine whether a foster parent is an agent or employee of the state. The subject matter jurisdiction of the circuit court, and of this court, turns upon the answer to that question. The majority failed to answer this question, choosing instead to assume subject matter jurisdiction based on an insufficient record. To be sure, the majority might have concluded that foster parents are not agents or employees of the state. It would thus follow that the action against the Stasses is not barred by the doctrine of sovereign immunity. However, the majority chose not to determine whether foster parents are agents or employees of the state, relying instead on the insufficiency of the record on appeal. I suggest this court cannot assume subject matter jurisdiction in the absence of a complete record. I also believe that a foster parent is an agent of the state. The state's control over various aspects of the care foster parents provide to foster children is pervasive. Further, the state has a nondelegable duty to care for its wards. In electing to place foster children with foster parents, the state does not relieve itself of its obligation to care for its wards or of its liability when its duty to its wards is breached. Lastly, I believe that a foster parent does not stand *in loco parentis* to the foster child because the foster parent does not assume financial responsibility for the foster child. Consequently, the doctrine of parental immunity should not be extended to protect foster parents from negligence actions. The majority asserts that the "result in this case does not represent an undue expansion of the immunity doctrine." 192 Ill. 2d at 246. I disagree. For these reasons, I respectfully dissent.