PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  08-2766
_____

I.H., BY AND THROUGH HIS GUARDIAN AD LITEM,
STEVEN A. LITZ, ESQUIRE

                                        Appellant
              v.

COUNTY OF LEHIGH;
TOPTON HOUSE LLC, TRANSACTING
AS TOPTON HOUSE; TOPTON MANAGEMENT
SERVICES, INC.;
THE LUTHERAN HOME AT TOPTON; JANE DETRA
DAVENPORT, ESQUIRE; PETER NORTON

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-04-cv-03890)
District Judge: Honorable Timothy R. Rice

_____

Argued October 1, 2009

Before: AMBRO, GARTH and ROTH, <u>Circuit Judges</u>

Opinion filed: July 7, 2010

Stephen A. Saltzburg, Esquire (Argued)
George Washington University Law School
2000 H Street, N.W.
Washington, D.C.   20052-0000

Eric H. Weitz, Esquire
Weitz Garfinkle Datz, LLC
121 South Broad Street - 20th Floor
Philadelphia, PA   19107

      Counsel for Appellant

Michelle D. Coburn, Esquire
Kim Kocher, Esquire (Argued)
I. Steven Levy, Esquire
White & Williams
1650 Market Street
1800 One Liberty Place
Philadelphia, PA   19107-0000

      Counsel for Appellees

Thomas W. Corbett, Jr.
  Attorney General
Calvin R. Koons
  Senior Deputy Attorney General
John G. Knorr, III

Chief Deputy Attorney General
Office of Attorney General of Pennsylvania
Appellate Litigation Section
Strawberry Square, 15th Floor
Harrisburg, PA   17120-0000
Counsel for Amicus Appellee
Commonwealth of Pennsylvania

John F. Yaninek, Esquire (Argued)
Kathleen Doyle Yaninek, Equire
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, PA 17110-0950
Counsel for Amicus Appellee
Pennsylvania Children & Youth
Administrators Association

Jonathan Vipond, III, Esquire
Jayson R. Wolfgang, Esquire
Buchanan Ingersoll & Rooney
213 Market Street, Third Floor
Harrisburg, PA   17101
Counsel for Amicus Appellee
Pennsylvania Council of Children
Youth & Family Service

---

OPINION OF THE COURT

---

3

AMBRO, Circuit Judge

In December 2002, a car accident paralyzed a foster care child, I.H. A jury found that his foster father's negligent driving caused I.H.'s injury. The single issue before us in this tragic case is whether a private foster care agency can be vicariously liable for the ordinary negligence of a foster parent. The District Court held no, and granted the foster care agency's motion for summary judgment on this issue. We affirm.

## I. Facts

In November 1998, a court determined I.H., then three years old, was a "dependent child." As a result, Lehigh County took legal and physical custody of him.

With the Lutheran Home at Topton's assistance, Lehigh County placed I.H. with foster parents, Peter and Atlanta Norton.[1] The County had contracted with the Home to aid with foster child placement and related supervision. The Contract of Service (the "Service Contract") between the parties imposed

---

[1] In his Amended Complaint, I.H. labeled Topton House, LLC, Topton Management Services, Inc., and the Lutheran Home at Topton, collectively, as "the Topton Defendants." Topton House, LLC and Topton Management Services, Inc. were subsequently dismissed from the suit. Only the Lutheran Home at Topton is before us on appeal.

several obligations on the Home, including:

> supervising each foster child's placement; submitting to the County individual service plans, progress reports, discharge summaries, and other written reports required by the County or regulations pertaining to each foster child; submitting to the County medical, dental[,] and educational information; and providing notification to the County if it proposes changing a foster child's placement from one foster home to another.

In exchange for providing these services, the Home received a daily fee of $43.75 for each child under its supervision. In turn, it paid its foster parents $17.00 per day.

Prior to I.H.'s placement, the Home entered into a Foster Care Placement Contract of Agreement (the "Placement Agreement") with the Nortons. In it, the Nortons promised "to receive a foster child [into their home] . . . and to be responsible to meet [his] physical, social[,] and emotional needs." It also contained baseline requirements intended to guide I.H.'s care. Many of these provisions incorporated specific items from the Service Contract (including various state regulations). However, the Placement Agreement included additional requirements imposed by the Home itself. The Nortons also received a Foster Care Handbook (the "Handbook"), which

outlined the family's obligations in greater detail. In the end, the parties agreed that "it is the responsibility of the Home and foster family to work together on behalf of [I.H.]" Importantly, both the Home and the Nortons had the power to terminate the Placement Agreement with reasonable notice.

At various times the Home was quite active in supervising I.H.'s care. For instance, shortly after I.H.'s placement, the Home received reports that the Nortons were using inappropriate methods to discipline and toilet train him. These methods violated the Nortons' obligations under their Placement Agreement, as well as related Pennsylvania law.[2] In response, the Home met with the Nortons and counseled them on proper disciplinary methods.

A few months later, I.H. and his foster brothers were swimming in the Nortons' pool. They had just returned home from a party. While unsupervised, I.H. nearly drowned. Mr. Norton pulled the child from the pool, and Mrs. Norton administered life-saving CPR. As a result of this incident, the County and I.H.'s court-appointed guardian instructed the Home to increase the frequency of its in-house visits with the foster family. They also directed the Home to provide additional training to the Nortons and use their supervisory authority to

---

[2] Under Pennsylvania law, foster children may not be "punish[ed] for bedwetting or actions related to toilet training." 55 Pa. Code § 3700.63.

intervene further, as needed.

In December 2002, Mr. Norton was bringing I.H. home from daycare. During that trip, Mr. Norton was momentarily distracted when I.H. bit Thomas (Mr. Norton's son) on the arm. Mr. Norton glanced in his rearview mirror to see what was happening and to reprimand the boys. With this distraction, he crossed the center line of the road and hit an oncoming car. Thomas was killed, and Mr. Norton was severely injured. I.H. was rendered paraplegic.

## II. Procedural History

In August 2004, I.H., through his guardian *ad litem*, filed an action against Mr. Norton, Lehigh County, and the Home to recover for his injuries. I.H. brought the following claims in his initial Complaint: 1) ordinary negligence against Norton; 2) constitutional violations against Lehigh County for alleged deliberate indifference; and 3) direct liability against the Home for negligent placement and supervision. Even an Amended Complaint did not allege that the Home was vicariously liable for Norton's negligence, but I.H.'s later summary judgment motion referred to it.[3]

---

[3] We may address this issue because the Home was on notice of the claim, did not argue in our Court that the issue was waived, and addressed the issue on the merits in its brief to us. *See Hedges v. Musco*, 204 F.3d 109, 122 (3d Cir. 2000) (*citing

In March 2006, I.H. filed a Motion for Partial Summary Judgment. The District Court denied his motion on the ground that genuine issues of material fact existed as to whether Norton was negligent. In October 2006, the Home and Lehigh County filed motions for Partial Summary Judgment. The District Court granted both motions. In its opinion, the Court addressed the merits of I.H.'s vicarious liability claim, concluding that it "fails as a matter of law because the requisite master-servant relationship does not exist between the Home and Peter Norton." The Court reasoned that most of the rules imposed on Norton in the Placement Agreement and the Handbook were the product of state regulations. It added that this setting of state-mandated standards and goals addressed the results of the work and not the manner in which it was conducted, leaving the Nortons free to make the same decisions for I.H. that they would make for their own children on a daily basis. (The Court further held that the Home's actions were not the proximate cause of I.H.'s injuries. Thus, it was not directly liable for them, either.)

In March 2007, I.H. filed a motion requesting that the District Court certify its decision for immediate appeal. Specifically, I.H. sought review of the Court's determination that there were no genuine issues of material fact with respect to the existence of a master-servant relationship between the Home

*Johnson v. Horn*, 150 F.3d 276, 284 (3d Cir. 1998); and *Venuto v. Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, P.C.*, 11 F.3d 385, 388 (3d Cir. 1993)).

and Norton.  After initially denying this request, the Court *sua sponte* vacated its decision and certified this matter for appeal. We denied the request.

I.H.'s claim against Norton continued to trial.  The jury returned a unanimous verdict, finding Norton negligent and awarding $28,750,000 in damages.  After entry of a final judgment, I.H. appealed the District Court's summary judgment order from February 2007.  I.H. limited his appeal to the Court's dismissal of his vicarious liability claim against the Home.

## III.  Jurisdiction and Standard of Review

The District Court had jurisdiction to hear this case under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

The standard of review for a grant of summary judgment is "plenary."  *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1321 (3d Cir. 1995).  When considering a grant of summary judgment, we employ the same legal standard as the District Court.  *Kelly v. TYK Refractories Co.*, 860 F.2d 1188, 1192 (3d Cir. 1988). Summary judgment is only proper where, when viewing the record in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed.

9

R. Civ. P. 56(c).[4]

## IV. Analysis

To repeat, the single issue before us is whether a private foster care agency can be vicariously liable for a foster parent's act of ordinary negligence. Although this is an issue of first impression under Pennsylvania law,[5] our conclusion is dictated

---

[4] "Generally, it is a jury question whether a person is an agent or an independent contractor." *Mahon v. City of Bethlehem*, 898 F. Supp. 310, 312 (E.D. Pa. 1995). I.H. thus argues that the District Court "usurped the jury's role" by granting summary judgment in this case. Appellant's Br. 13. This is overstated. Both parties concede that the relationship between the Home and Norton is governed by an agreement between them. *See* Appellant's Br. 10, 22; Appellee's Br. 3-4, 13. Therefore, the District Court was within its power to decide whether that agreement gave rise to a master-servant relationship as a matter of law. *See Cox v. Caeti*, 279 A.2d 756, 758 (Pa. 1971) ("[W]here the facts [underlying an alleged master-servant relationship] are not in dispute, the question of the relationship becomes one for determination by the court."); *see also Valles v. Albert Einstein Med. Ctr.*, 805 A.2d 1232 (Pa. 2002); *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622 (Pa. Super. Ct. 1993).

[5] Appellant's counsel suggested at oral argument that this case presents a question of first impression for any Circuit Court of Appeals. *See* Oral Arg. Tr. 15 ("This is a case of first

by well-established legal principles.

## A.    The "Master-Servant" Relationship and the "Right of Control" Test

In Pennsylvania, only a "master-servant" relationship "gives rise to vicarious liability for negligence." *Smalich v. Westfall*, 269 A.2d 476, 481 (Pa. 1970). "As a general rule, a master may be held liable for the acts of the servant when those

---

impression, and it's all Pennsylvania law."); *see also* Appellee's Br. 14 ("[T]here is no known Pennsylvania appellate precedent specifically involving the relationship between a foster care agency and foster parent . . . ."). Counsel is correct, to our knowledge. Several states have considered similar questions, but those cases have focused principally on the relationship between foster parents and the state. *See, e.g.*, *Hunte v. Blumenthal*, 680 A.2d 1231 (Conn. 1996); *Nichol v. Stass*, 735 N.E.2d 582 (Ill. 2000); *Mitzner v. State*, 891 P.2d 435 (Kan. 1995); *Miller v. Martin*, 838 So.2d 761 (La. 2003); *Archer v. DARE Family Servs.*, No. CA 98-04354, 2002 WL 243649 (Mass. Super. Ct. Feb. 4, 2002); *Simmons v. Robinson*, 409 S.E.2d 381 (S.C. 1991). *But see Commerce Bank v. Youth Servs. of Mid-Ill., Inc.*, 775 N.E.2d 297 (Ill. App. Ct. 2002) (addressing the relationship between a foster care agency, foster parents, and a foster child); *M.H. v. Barber*, No. C6-99-16, 1999 WL 343806 (Minn. Ct. App. June 1, 1999) (same); *McCabe v. Dutchess County*, 895 N.Y.S.2d 446 (N.Y. App. Div. 2010) (same).

11

acts are committed during the course of his employment and within the scope of his authority." *Valles v. Albert Einstein Med. Ctr.*, 805 A.2d 1232, 1237 (Pa. 2002). The rationale for this rule is simple: "[B]ecause a master has the right to exercise control over the physical activities of the servant within the time of service, he *is* vicariously liable for the servant's negligent acts committed within the scope of his employment." *Smalich*, 269 A.2d at 481 (emphasis in original).

In a master-servant relationship, "a master not only controls the results of the work but also may direct the manner in which such work shall be done." *Id.*; *see also Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd.*, 762 A.2d 328, 333 (Pa. 2000) ("[C]ontrol over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status.").[6] "[A] servant, in rendering the

---

[6] The Pennsylvania Supreme Court has also set out several discrete factors that should be considered in the master-servant inquiry:

> Control of [the] manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the

12

agreed services, remains entirely under the control and direction of the master." *Smalich*, 269 A.2d at 481. When determining whether a master-servant relationship exists, "[a]ctual control of the manner of work is not essential; rather, it is the right to control which is determinative." *Drexel v. Union Prescription Ctrs., Inc.*, 582 F.2d 781, 785 (3d Cir. 1978).

Under this "right of control" test, "[t]he control of the principal does not . . . include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." *Smalich*, 269 A.2d at 481 (internal quotation marks and citation omitted). Although this passage might suggest a lenient "right of control" test, the right to exercise day-to-day control remains an important factor in the master-servant inquiry. *See, e.g.*, *Smith v. Exxon Corp.*, 647 A.2d 577, 583 (Pa. Super. Ct. 1994); *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622, 626 (Pa. Super. 1993); *Burnatoski v. Butler Ambulance Serv. Co.*, 567 A.2d 1121, 1124 (Pa. Commw. Ct. 1989). The party seeking vicarious liability bears the burden of proving a master-servant relationship. *See Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000).

---

employer; and also the right to terminate the employment at any time.

*Id.* (internal quotation marks and citation omitted).

13

**B.    Applying the "Right of Control" Test**

In this context, the dispute between the parties focuses on the scope of control that the Home could exercise over Norton—not the level of control that the Home actually exercised during I.H.'s placement.  I.H. argues that, because Norton was in the act of caring for him at the time of the accident, the Home should be held vicariously liable for any injuries caused by Norton's conduct.  Under this far-reaching theory, a private foster care agency's liability would extend to all acts of ordinary negligence committed by a foster parent in the provision of foster care—which is defined by relevant regulations as a "[t]wenty-four hour" commitment. 55 Pa. Code § 3700.4.[7]

---

[7] As the system now stands, private foster care agencies remain liable for their own acts of negligence—for instance, in negligently placing a child in an unsuitable environment.  It is simply not true, as I.H. contends, that the District Court's ruling allows private foster care agencies to accept payment from the State and then simply "wash [their] hands of responsibility for what happens next." Appellant's Br. 18.  Instead, if a foster care agency fails to perform its duties in a given case, a direct claim of negligence can be made out against it for a breach of those duties—just as I.H. did (albeit unsuccessfully) in this case.  Therefore, a "foster care agency . . . remain[s] liable in those instances where the breach of its duty 'to exercise due care in the selection of foster parents and to oversee diligently the rendition of proper care by the foster parents' results in injury."

14

Such a theory would impose a considerable financial burden on the Pennsylvania foster care system.[8]   More

---

*Blanca C. v. Nassau County*, 103 A.D.2d 524, 532-33 (N.Y. App. Div. 1984) (*quoting Bartels v. Westchester County*, 76 A.D.2d 517, 523 (N.Y. App. Div. 1980)).

[8] Other states have recognized this danger.  *See, e.g.*, *Stanley v. State Indus., Inc.*, 630 A.2d 1188, 1191 (N.J. Super. Ct. 1993) ("To adopt such a [vicarious liability] theory would place an intolerable burden upon the State and might well diminish the beneficial effects of the foster parent program and compel a return to institutional care as the sole means of addressing the plight of abused and neglected children.") (internal quotation marks and citation omitted); *Blanca C.*, 103 A.D.2d at 532 (warning that placing vicarious liability on the foster care system could create a "potentially crushing financial burden . . . [that] might prompt the County to restrict or abolish its foster care program in favor of institutional placement"); Laura A. Harper, Note, *The State's Duty to Children in Foster Care—Bearing the Burden of Protecting Children*, 51 Drake L. Rev. 793, 797-98 (2003) ("The child welfare system is severely underfunded . . . . The inadequacies of this system lie in stark contrast to the burgeoning population of children in need.").

The *amici* in this case present similar arguments.  *See* Commonwealth's Br. 3 ("Private, non-profit organizations like the Lutheran Home play an indispensable role in Pennsylvania's foster care system, a role which would be threatened if they are to be held vicariously liable in situations like this."); Pennsylvania Council of Children, Youth and Family Services'

importantly, it is also contrary to established Pennsylvania law. In reaching this conclusion, we first consider the terms of the Service Contract between Lehigh County and the Home. From there, we analyze the Placement Agreement between the Home and Norton. Throughout, we consider these agreements in light of the regulatory scheme enacted by the Commonwealth, as well as related Pennsylvania caselaw.

### 1. The Service Contract

I.H. stakes much of his argument on a single passage from the "Independent Contractor" provision of the Service Contract. In relevant part, this provision states that the Home "is deemed an Independent Contractor and shall not during the term of this contract assign, subcontract, transfer, or otherwise delegate all or part of its obligations or responsibilities without

---

Br. 12 ("The imposition of vicarious liability on a foster care agency for the ordinary negligence of a foster parent would have a dire impact on the financial viability of foster care agencies and significantly impair the ability of the Commonwealth, through its counties, to provide an array of care and services to dependent and delinquent children."); Pennsylvania Children and Youth Administrators Association's ("PCYAA") Br. 15 ("A judicial determination that a foster care agency is vicariously liable for a foster parent's ordinary negligence would seriously affect Pennsylvania's foster family program as it now operates and would greatly hinder future placement efforts.").

prior written approval of [Lehigh County]." From this, I.H. argues that the Home had a non-delegable duty to exercise all control necessary to ensure his safety. On this reading, the Home committed itself to providing more than initial placement and ongoing monitoring of established goals; it also must exercise additional control over the manner of its foster parents' care (on a daily basis, if necessary). According to I.H., it is thus no argument that the Home did not exercise this control, including when supervising I.H.'s care by the Nortons. The Home had the duty to exercise whatever level of control was necessary to keep I.H. safe.[9]

---

[9] These arguments are similar to those made by the Connecticut Supreme Court in *Hunte v. Blumenthal*, 680 A.2d 1231 (Conn. 1996). There, the Court explained:

> It is true . . . that foster parents currently decide when the child goes to bed at night, when enough television time has been had, or when the child may go swimming. Foster parents have this discretion, however, only because the department has chosen not to take it away. Nothing prevents the department from enacting regulations . . . that specify the hour at which a child must go to bed, that limit the amount of television a child may watch[,] or that restrict the hours a child may spend in the pool.

*Id*. at 1236 (internal quotation marks omitted). But in *Hunte* the

17

Scattered provisions of the Service Contract strengthen this reading. For instance, the "Purpose of [the] Contract" between the Home and Lehigh County was defined (quite broadly) as "Residential/Foster Care," while the Home elsewhere agreed to provide "Foster Care . . . Services." Furthermore, the Home promised to "promote [each] child's growth and development by providing the physical care, nurturance[,] and opportunity [necessary] for individual, social, emotional[,] and intellectual development." Finally, the Home agreed to accomplish these goals by: 1) "provid[ing] a temporary living environment in the form of foster family care"; 2) "retain[ing] responsibility of [I.H.'s] physical custody" throughout his placement; and 3) "actively participat[ing] in the delivery of [related foster care] services."

Given these provisions, I.H. concludes that the Home was charged with running a "foster care" program, with non-

Court was considering whether foster parents qualified as state employees under the state-administered foster care system. In that case, the state had complete control over the structure of the foster care system itself.

Here, the Home's control over Norton is constrained by the regulatory goals prescribed by the Commonwealth. And even the *Hunte* Court conceded that its decision was an outlier. *See id.* at 1241 ("We recognize that the majority of courts in other states that have considered this issue have concluded that foster parents are not employees of the state.").

18

delegable responsibilities that extended beyond mere placement and supervision to additional control over the manner in which the Nortons cared for I.H. on a daily basis. These textual arguments, simple and supportive, nonetheless fall short.

First, I.H. reads too much into the "Independent Contractor" provision. Recourse to it merely begs the key question on appeal. It provides that the Home "shall not . . . delegate all or part of its obligations or responsibilities without prior written approval." This provision says little about what those "obligations" and "responsibilities" are. As the Illinois Supreme Court recently noted in a similar context, "whatever duty there is to provide placement, to institute procedures, or even to exercise general authority over foster children[,] is not the same as a continuing, nondelegable duty to provide for the care of children placed in foster homes." *Nichol v. Stass*, 735 N.E.2d 582, 589 (Ill. 2000).

Furthermore, many of the provisions that I.H. cites apply equally to a Service Contract providing for foster care placement and ongoing monitoring rather than one including additional responsibilities for directing the manner of care the foster parents need to provide on a daily basis. For instance, the Home's purported duty to "provide a temporary living environment in the form of foster family care" can be met through placement services. The same is true of the Home's obligation to "promote a child's growth and development by providing the physical care, nurturance[,] and opportunity

19

[necessary] for individual, social, emotional, and intellectual development." And while the Home agreed to "actively participate in the delivery of services," this need not extend to all (or even most) of the Nortons' day-to-day parenting decisions. Indeed, this passage itself is part of a larger paragraph on the role of caseworkers in "monitor[ing]" foster families.

The Home's level of control is further clarified by the following passage, which was part of a program description incorporated into the Service Contract by the parties: "The Lutheran Home strives to provide the most stable and caring environment for children. Proper recruitment and training of foster parents, careful matching of children and families, and viable accessible *supports* for foster parents and foster children are in place in order to avoid multiple placements." J.A. 517 (emphasis added). In this passage, the Home defined its key duties as foster family recruitment, foster child placement, and ongoing supervision.

Other passages in the program description also aid this account of the Home's responsibilities. Among them, the Home pledged "to provide supportive services to [its] foster families," which were intended to "under-gird the foster parents' effectiveness in providing a stable, nurturing environment for the foster children in their care." In addition, the Home put in place a referral procedure for processing requests from Lehigh County: "A referral for foster care placement can be made by

20

the county by contacting the foster care supervisor. A verbal description of [a] child's [characteristics] . . . [is] necessary in order to provide the most appropriate foster family setting." Importantly, "[a]cceptance of the referral is contingent upon whether a suitable match can be made between the child and a foster family and the availability of an opening." Therefore, if a "suitable match" with a family were not made, the Home would not accept a referral from Lehigh County.[10]

Moreover, within the Home's program approved foster families agree to "provide room/board, basic physical care, health care, and supervision," as well as provide for the child's "developmental needs." In this role, foster parents must "participate in the development of the [child's] [i]ndividual [s]ervice [p]lan" and "facilitate many of the objectives outlined in the plan."

Related regulations provide further support for this account. Pennsylvania law defines a "foster family care agency" as "[a] public or private agency which recruits, approves,

---

[10] This process is similarly outlined in the Handbook given to the Home's foster parents. *See* J.A. 557 ("Topton Foster Care program accepts a child whose needs can be met in a community-based setting. It is important to address the child's specific needs by choosing a foster family that exhibits strengths in the areas that are vital to the child's positive growth and development.").

21

supervises[,] and places children with foster families." *See* 55 Pa. Code § 3700.4. In this capacity, it is a stand-in for the county, which would typically be responsible for these tasks. At the same time, a foster family is defined as "[t]he living unit, including the foster family residence and foster parent, approved by a foster family care agency to provide foster family care to children." *Id.* Similarly, a foster parent is defined as "[a]n individual responsible for providing foster family care to children placed by a[] [foster family care agency]." *Id.* Within this scheme, foster families are tasked with "[p]rovid[ing] temporary, substitute care" for each "child in need." *Id.* at § 3130.5.

In addition, the Service Contract itself suggests that it should be read in light of these regulatory goals, as the Contract's "Interpretation" provision provides that it is "the intention of the [parties] that the public health, safety[,] and welfare be protected and furthered by the [C]ontract. Therefore, this [C]ontract is to be interpreted in such manner as to favor such public interest as opposed to any private interest." As the Home's counsel explained at oral argument, "The [service] contracts are written in light of [related] code provisions." Oral Arg. Tr. 24. Analyzing the Service Contract in light of related regulations, the Home argues that its duty is to provide "foster care indirectly through a foster family" and "assist the county in placing children in foster families." *Id.* at 25, 26. The Pennsylvania Children and Youth Administrators Association ("PCYAA") similarly explained, "Private foster care agencies

22

cannot and do not supervise and control the day-to-day . . . care that a foster parent provides a foster child. Foster care agencies do not have the power or authority to exercise this type of control over foster parents." PCYAA's Br. 10-11. These accounts are consistent with the role of a "foster family care agency" as defined by Pennsylvania's regulatory scheme.

Taken together, these passages suggest that the Home's duties extended only to initial placement and ongoing supervision of established goals, not to the manner in which the Nortons chose to achieve each of these goals. Therefore, the Service Contract, standing alone, is insufficient to establish a master-servant relationship. Yet this does not end the master-servant inquiry. It is still possible that the Home's related supervisory responsibilities give rise to a master-servant relationship. To that end, we turn to the Placement Agreement and accompanying Handbook.

### 2. The Placement Agreement and the Handbook

Under the Placement Agreement and the Handbook, the Home had the right to control many facets of I.H.'s care. Under the Agreement, Norton was assigned a "Topton foster care caseworker."[11] In addition, Norton agreed that "[f]requent

---

[11] First, the Home develops "[a] treatment plan," which is then "reviewed with the foster family." Over time, the Agreement requires the following: 1) after three months, the

23

contacts between the caseworker . . . and the foster parents [we]re necessary [so] both c[ould] discuss observations, difficulties, general development, and future plans regarding [I.H.]." To that end, the Agreement provided for biweekly visits by the caseworker to the foster home for the first two months of placement and monthly visits thereafter ("at the discretion of the caseworker and supervisor").

Apart from these ongoing visits, the Home also set various standards for I.H.'s care. In its Handbook, the Home "detail[ed] foster care practices, foster parent/Topton roles and responsibilities, and current foster care regulations." As new foster parents, the Nortons were required to participate in an orientation, which outlined "Topton philosophy, practices, foster parent and Topton's roles and responsibilities, and applicable regulations for foster care." These "practices" and "regulations" included rules dealing with a foster child's money, clothing,

caseworker must complete an initial evaluation form and discuss it with the foster family; 2) "periodic[ally]" the caseworker must make determinations as to the "suitability of the placement"; and 3) annually the caseworker must make written re-evaluations of the foster home, with a copy provided to the foster parents. In the event of revisions to the treatment plan, both I.H. and Norton "must participate in the planning process, if this is appropriate." Furthermore, at the outset "[t]he foster family, county agency staff, and [the Home] staff must *all* be in agreement regarding the appropriateness of the placement." (emphasis in original).

24

medical and dental treatment, education, employment, transportation, recreation, religious practices, tobacco use, and vacations. They also included standards that governed its foster parents on everything from disciplinary practices to the frequency of photograph-taking. The Home even "reserve[d] the right to question the adequacy of meals, clothing, recreational opportunities, or other needs being provided by the foster family." In addition to these "paper" provisions, the level of control that the Home actually exercised during I.H.'s placement further suggests the limited scope of foster parent autonomy within the Home's foster care program—with the Home's frequent phone calls and visits (to say nothing of their direct interventions involving the Nortons and I.H.).

While true that the relationship between Norton and I.H. was not that of a biological parent and his children,[12] this does not settle the master-servant question. The test is not whether Norton retained as much control over I.H. as a biological parent; it is whether the Home had sufficient control over Norton to result in a master-servant relationship. We hold that it did not.

First, in the Placement Agreement, Norton agreed "to be responsible for meeting the physical, social[,] and emotional

_____

[12] Indeed, in the Placement Agreement, Norton explicitly "agree[d] . . . that foster family care is not intended to supersede parental rights, responsibilities, and relationships between the child and his natural parents."

25

needs of [I.H.]" on an ongoing basis, leaving the Home with the related responsibility of "assisting" Norton in achieving these goals. This passage alone suggests a division of labor inconsistent with a master-servant relationship, with Norton responsible for daily parenting decisions and the Home merely responsible for setting goals and providing additional support (as needed). Under Pennsylvania law, that the Home "set[] certain standards in order to maintain a uniform quality of . . . service only addresse[d] the *result* of the work and not the *manner* in which it [wa]s conducted." *Myszkowski*, 634 A.2d at 627 (emphases in original). This is insufficient to establish a master-servant relationship.

Second, in the specific context of transportation, the Home's responsibilities under the Service Contract were narrow, and its control over Norton attenuated: the Home simply agreed to "guarantee[] all drivers hold a valid, appropriate driver's license." The Placement Agreement is not in tension with this. Rather than exerting continuous control over Norton's manner of driving, the Home stipulated that anyone driving I.H. had to have a driver's license and adequate insurance coverage—subject to certain common-sense (and state-imposed) safety guidelines.[13] Indeed, the Home even permitted other

---

[13] For instance, no one under the age of 18 could transport the foster child without the permission of either Lehigh County or the Topton Foster Care Director. Furthermore, the vehicle itself had to "be validly licensed and inspected," the number of

26

adults to drive I.H., at the discretion of Norton, subject only to the "expectation" that Norton "knows the driver, the destination, and is able to validate that the driver has a current motor vehicle driver's license and adequate insurance coverage." Taken together, these requirements fulfilled the Home's obligations under the Service Contract and established less extensive control over Norton's transportation responsibilities than in other areas.

Finally, the source of many of the more invasive requirements within the Placement Agreement was the Commonwealth itself—either through statute or regulation—not the Home. Under Pennsylvania law, these requirements alone do not result in a master-servant relationship. In *Universal Am-Can*, the Pennsylvania Supreme Court held that an agreement between a hauling company and the owner-operator of a tractor-trailer did not establish a master-servant relationship. On examining the agreement between the parties, the Court observed that its provisions were "for the most part governed by federal regulations," including "requirements for mandatory inspections, for observing speed limits, and for covering loads with tarps." *Universal Am-Can*, 762 A.2d at 334, 335. It added:

---

passengers in the car could "not exceed the passenger capacity as determined by the vehicle manufacturer," and "[s]afety restraints" had to be "used by occupants." Finally, the foster child had to "wear seat belts *at all times*, or be securely restrained in an appropriate car seat." (emphasis in original).

27

Factors which demonstrate compliance with government regulations do not assist in the application of the [right-of-control] test. The existence of the regulations precludes [the parties] from negotiating any terms subject to the regulations. Neither party has bargaining power, or the ability to control the work to be done, when dealing with matters subject to regulation.

*Id.* at 334-35. As a result, the Court concluded that the regulations were "not probative" of the master-servant issue, as they "reflect the control of the government, not the motor carrier." *Id.* at 336.

Because federal and state regulations controlled the essential elements of the trucker's work, the Court concluded that other features of the Agreement (which were not dictated by government regulations) also fell short of establishing a master-servant relationship. These additional features included requirements to communicate with the dispatcher every 12 or 24 hours, submit fuel and toll receipts, and take a mandatory one-hour stop for meals. *See id.* at 337-38 (Cappy, J., concurring in part and dissenting in part).[14]

---

[14] Given the holding in *Universal Am-Can*, it is hardly surprising that the District Court relied heavily on an analogous Illinois foster care case, *Commerce Bank*. There, a three-year-old foster child died while enclosed in a bedroom closet by her

28

The Home argues that the same is true here. And, indeed, the Placement Agreement and Handbook do overlap with state regulations in many key areas. For instance, the Pennsylvania Administrative Code reads: "The county agency shall provide an opportunity for a child placed in a foster home or child care facility which it administers to participate in religious activities, services[,] and counseling, taking into account the choices specified by the parents or guardian or the child." 55 Pa. Code § 3130.86. The Placement Agreement

---

foster parents. The child had been placed with the foster family by a private foster care agency. Representatives for the foster child brought a vicarious liability claim against the foster care agency for the foster parents' negligence. Much like the Home, "it was [the agency's] responsibility to find foster parents, make sure that the foster parents and their home complied with [state] licensing requirements, and then monitor the foster children in accordance with [state] regulations and Illinois law." *Commerce Bank*, 775 N.E.2d at 298. The agency also "provided services to the children, created plans, distributed state money to the foster parents, and monitored the foster parents, all pursuant to [state] regulations." *Id.* at 298-99. The Court concluded that this relationship did not call into play vicarious liability, even as it conceded that the foster care agency had "the right to control a great deal of the day-to-day supervision and parenting of the foster children." *Id.* at 301. The agency "was essentially acting in [the State's] place" by monitoring state-mandated requirements rather than exercising its own control over its foster parents. *Id.* at 302.

largely tracks the Code's language, providing that "[a]ll children are to be given reasonable opportunities for religious expression within the broad religious preferences of their choice or that of their parents." This is only one of several examples of how the Placement Agreement and the Handbook track state regulations. Others include the regulation of a foster child's money,[15] education,[16] safety,[17] medical and dental care,[18] residence,[19]

---

[15] *Compare* J.A. 559 ("Money earned, received as a gift[,] or received as allowance by a child is the child's personal property.") *with* 55 Pa. Code § 3130.85 (same).

[16] *Compare* J.A. 565 ("Children who receive services from our agency shall be enrolled in, or have access to, education in conformance with the Public School [C]ode of 1949.") *with* 55 Pa. Code § 3130.87 ("The county agency shall ensure that children who are receiving services are enrolled in, or have access to, education in conformance with the Public School Code of 1949 . . . .").

[17] *Compare* J.A. 582 (providing various safety requirements, including those pertaining to "dangerous material kept in the home," emergency phone numbers, fireplaces, smoke detectors, fire extinguishers, electrical outlets, electrical wires, and drinking water) *with* 55 Pa. Code § 3700.67 (same).

[18] J.A. 561-62 (outlining the various processes for obtaining consent for a child's medical and dental treatment), *and* J.A. 571 (providing for a physical examination within 30 days of placement, a dental examination within 60 days of placement,

grievance procedures,[20] transportation requirements,[21] and constraints on parental autonomy (including methods of

_____

and guidelines for future medical and dental appointments), *with* 55 Pa. Code § 3130.91 (requiring virtually identical processes to those outlined in the Handbook for obtaining consent for a child's medical and dental treatment), *and id.* § 3700.51 (providing a virtually identical timetable for medical and dental treatment).

[19] *Compare* J.A. 568 ("Topton Foster Care is required to inspect and evaluate foster homes to insure continued compliance with [DPW] regulations on an annual basis.") *with* 55 Pa. Code § 3700.66 (outlining DPW's "[f]oster family residence requirements").

[20] *Compare* J.A. 558 (outlining the Home's "Children's Grievance Procedure") *with* 55 Pa. Code § 3130.88 ("The county agency shall develop and implement a written policy and procedure governing the filing of a grievance by children placed in the foster homes and child care facilities that it operates.").

[21] *Compare* J.A. 574 ("A vehicle used in transporting children shall be validly licensed and inspected"; "[p]ersons transporting children shall possess a valid driver's license for the class of vehicle the person is operating"; and "[t]he number of persons in a vehicle used to transport children may not exceed passenger capacity as determined by the vehicle manufacturer.") *with* 55 Pa. Code § 3130.89 (same).

31

discipline[22] and training[23] requirements).

I.H. counters that not every provision in the Placement Agreement and Handbook was a product of state regulations. For instance, the Home included certain disciplinary practices beyond those enumerated under Pennsylvania law. The Home also exercised final authority over whether a child could partake in certain childhood rights-of-passage, including holding a summer job and driving a car. Finally, foster parents were prohibited from "sign[ing] any papers or documents other than school absence excuses, report cards[,] or items of a routine nature." I.H. contends that, even if *Universal Am-Can* applied, these additional provisions, among many others, would be enough to establish a master-servant relationship. We disagree.

---

[22] *Compare* J.A. 563-64 ("Foster children shall be directed with techniques that stress praise and encouragement . . ."; "[f]oster children may not be subjected to verbal abuse, derogatory remarks, or threats of removal from the foster home"; and "[p]assive physical restraint techniques are the only allowable method of physically intervening with an uncontrollable child's behavior.") *with* 55 Pa. Code § 3700.63 (same).

[23] *Compare* J.A. 585 ("Each foster parent must successfully complete a minimum of ten (10) hours of approved training annually.") *with* 55 Pa. Code § 3700.65 ("A foster parent shall participate in a minimum of 6 hours of agency approved training.").

*Universal Am-Can* does not mean that *all* requirements within an agreement must be the product of government regulations. Instead, in this case we must consider the foster care agency-foster parent relationship in light of related state regulations, as well as the provisions imposed by the Home itself.

> 3.  *The Relationship Between Foster Care Agencies, Foster Parents, and Foster Children Under Pennsylvania Law*

The relationship between a foster care agency and a foster parent is unlike that of the typical master and servant.[24] Within the framework provided by the agency, foster parents are given considerable latitude in meeting the goals of each child's individual service plan. This is by design, as the Commonwealth requires placements that, as much as possible, "replicate . . . the traditional family setting[]." 55 Pa. Code

---

[24] The Kansas Supreme Court recognized as much when it was considering the related question of whether a foster parent should be considered a state employee for purposes of vicarious liability. The Court observed, "The foster parent's actual status is . . . unique and does not actually fit within either [the label 'employee' or 'independent contractor']. A more apt description . . . would be more of an expense-reimbursed volunteer who must be licensed and who operates within certain guidelines." *Mitzner*, 891 P.2d at 438.

§ 3130.67(b)(7)(i). Implicit in the foster parent-foster child relationship is a level of parental autonomy that permits foster parents, on a daily basis, to adjust their care to the individualized needs of their foster child, just as biological parents would in a "traditional family setting."

The Pennsylvania Supreme Court has recently provided guidance in assessing relationships that are similarly "individualized" and "dynamic." In *Valles*, the plaintiff brought a claim against a hospital "premised . . . upon a theory of vicarious liability for the battery committed by [the doctor] due to his failure to obtain informed consent prior to performing [an] aortogram." 805 A.2d at 1234. The plaintiff argued that, "[b]ecause a hospital has an obligation to oversee all persons who practice medicine within its walls, . . . [it] as an employer and health care provider in its own right maintains a right of control in the relationship sufficient to justify the imposition of liability." *Id.* at 1236.

The Court affirmed the grant of summary judgment in favor of the hospital, concluding that the relationship between it and a staff radiologist in the context of informed consent was not that of a "master" and its "servant." This was despite the hospital exercising much control over the radiologist, including:

> its provision of the instrumentalities, place to work, support staff, patient base and wages; its right to require the employee's presence at a

34

particular time[,] and to terminate his employment; its retention of revenues for the employee's professional services; and its use of departmental organization, peer review, rules and regulations, credentialing[,] and privileging practices.

*Id.* at 1238. As the plaintiffs argued, the doctor's "exercise of independent medical judgment was subject to [the hospital's] right of control because: his work may not be delegated to others . . . ; his medical findings must be reported in a manner . . . set by hospital policy; and he must perform the requested study according to departmental protocols . . . ." *Id.*

The Court nonetheless declined to recognize a master-servant relationship, holding "as a matter of law [that] a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable." *Id.* at 1239. It explained that "a medical facility cannot maintain control over this aspect of the physician-patient relationship," since "[i]nformed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents." *Id.* The baseline was that it would be "improvident and unworkable" to "interject an element of a hospital's control into this highly individualized and dynamic relationship." *Id.*

We conclude that the Pennsylvania Supreme Court's

35

analysis in *Valles* should apply equally to the relationship between a foster care agency and its foster parent. Given the "highly individualized" and "dynamic" adjustments that foster parents must make in fulfilling the ongoing obligations to their foster children, it would be similarly "improvident and unworkable" to "interject an element of the [foster agency's] control into" such a relationship.[25]

### 4. Conclusion

Under its Service Contract, Lehigh County assigned to the Home the duty of selecting and approving prospective foster parents, assisting the County with suitable placements,

---

[25] I.H. also argues that our decision should be informed by *M.B. v. City of Philadelphia*, No. CIV. A. 00-5223, 2003 WL 1144307 (E.D. Pa. Mar. 13, 2003). In this unpublished District Court opinion, a male with a criminal record, who was permitted to live in the foster home by the foster parent, sexually molested the foster child. The foster care agency was contractually bound to evaluate changes in family composition and admittedly knew of the man's presence. In spite of this knowledge, the agency failed to perform a background check on him. Though the District Court noted that the foster parent and the foster care agency had an agency relationship, it did not base its decision "on the existence of an employee-employer (or servant-master) relationship." *Id.* at *2 n.2. Moreover, the case involved an intentional tort against the foster child rather than an allegedly negligent act. Thus we do not follow the path it points.

monitoring these placements, and submitting to the County individual service plans and various reports tracking each foster child. Although this provided the Home with a great deal of control over its foster parents, it fell short of imposing a "right of control" over the manner in which foster parents provided foster care to their foster children on a daily basis. The Home's Placement Agreement with the Nortons presented general guidelines for foster care and incorporated specific provisions of the Service Contract and state regulations. Instead of subjecting Norton to the continuous control of the Home, these documents generally addressed the results of the work and not the manner in which it was conducted. It gave the Home a broad supervisory role, but not the right to control the daily activities of the Norton family. On a daily basis, the Nortons decided how to meet I.H.'s physical, social, and emotional needs themselves. This was by design.

One of the key goals of the Pennsylvania foster care system "is to replicate as closely as possible the traditional family settings in which children are cared for and raised." *Leshko v. Servis*, 423 F.3d 337, 346 (3d Cir. 2005). This goal limits the scope of control that the foster care agency may exercise over its foster parents on a daily basis. Indeed, too much control over the day-to-day activities of foster families would make it impossible "to replicate . . . the traditional family setting[]." *Id*. Therefore, even with the level of control that the Home may have exercised under the Placement Agreement, the Nortons still exercised largely the same level of control over

37

I.H.'s day-to-day life as they did over their biological children. As the District Court noted, the Nortons still decided "the activities I.H. would engage in . . . , the food he would eat, [and] the books he would read." In addition, "[n]o one controlled what time the Nortons must awake I.H. in the morning, what time they must feed him, what time he must go to sleep, and what tasks or activities he should be doing at any given moment." For goals outlined by the Home, the Nortons were largely free to accomplish them as they saw fit. For items not contained in the Placement Agreement or the Handbook, the Nortons were free to treat I.H. as they would their biological children.

Of course, the Nortons were constrained in important ways by the Placement Agreement, and they were subjected to consistent monitoring by the Home. Nonetheless the Nortons still had a great deal of discretion on a daily basis over how to care for I.H. Much as the doctor-patient relationship in *Valles*, the foster parent-foster child relationship in this case was "highly individualized" and "dynamic," making it similarly "improvident" and "unworkable" to exercise a high level of control over the relationship. Moreover, such control would be inconsistent with the regulatory regime imposed by the Commonwealth.

\* \* \* \* \*

For these reasons, we hold that a master-servant

38

relationship did not exist between the Home and Norton. Hence the Home was not vicariously liable for Norton's ordinary negligence at issue in this appeal.

We therefore affirm.