**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1843

ASHLEY BLANKENSHIP,

             Plaintiff - Appellant,

      v.

NECCO, LLC, Successor-in-interest to Necco, Inc., d/b/a Necco, d/b/a Necco &
Associates,

             Defendant - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia at
Charleston.  John T. Copenhaver, Jr., Senior District Judge.  (2:16-cv-12082)

Argued:  December 12, 2018                        Decided: July 29, 2019

Before NIEMEYER, FLOYD, and RICHARDSON, Circuit Judges.

Affirmed by unpublished opinion.  Judge Richardson wrote the opinion, in which Judge
Niemeyer and Judge Floyd joined.

**ARGUED:**  Menis E. Ketchum, III, GREENE, KETCHUM, FARRELL, BAILEY &
TWEEL LLP, Huntington, West Virginia, for Appellant.    Wesley Paul Page,
FLAHERTY SENSABAUGH BONASSO PLLC, Charleston, West Virginia, for
Appellee. **ON BRIEF:** Larry A. Bailey, GREENE, KETCHUM, FARRELL, BAILEY
& TWEEL LLP, Huntington, West Virginia, for Appellant.   Thomas V. Flaherty,
FLAHERTY SENSABAUGH BONASSO PLLC, Charleston, West Virginia, for
Appellee.

RICHARDSON, Circuit Judge:

With the assistance of Necco, LLC, the state of West Virginia placed Ashley Blankenship's infant daughter Aubree in the care of foster parents Stephen and Charity Walls. Soon after Aubree began to live with the Wallses, she died in her sleep one night. Blankenship sued, claiming the couple's negligence caused Aubree's death and that Necco should be held vicariously liable. Necco moved for summary judgment, arguing that its relationship with foster parents does not make it vicariously liable for any negligent acts they may commit. The district court agreed and granted Necco's motion. We affirm.

**I.**

The day after she was born, Aubree was removed from Blankenship's custody by the Circuit Court of Mingo County, West Virginia, which had found that the child's physical wellbeing was in imminent danger from her parents. The court then placed Aubree into the custody of the West Virginia Department of Health and Human Resources (DHHR). As permitted by law, DHHR enlisted Necco, a licensed child placing agency, to find Aubree a private foster home. *See* W. Va. Code §§ 49-2-101, 106.

Before Necco could place a child with foster parents, it was required to obtain from them a good health certification and perform a home study and criminal background check. *See* W. Va. Code St. R. §§ 78-2-13, 78-2-16. On top of this, foster parents had to undergo extensive training. *See* W. Va. Code St. R. § 78-2-20.

This training required Necco to provide foster parents with its foster parent handbook. The handbook included the "necessary policies, procedures, laws and forms" for foster parents. W. Va. Code R. § 78-2-8.5.a. Thus, much of the handbook reflected state law. And Necco was required to keep this handbook current to reflect any legislative changes. W. Va. Code R. § 78-2-8.5.b. The handbook also implemented Necco's contractual obligations as a child placing agency with DHHR. These contractual obligations significantly mirrored the state regulations, detailing Necco's responsibilities for foster-parent recruitment and training, and for providing health care and education of the foster children. *Compare* J.A. 70–71 (Necco's contract with DHHR), *with* W. Va. Code St. R. § 78-2-9 (laying out basic rights of foster children from clothing, religious preferences, and healthcare to shelter, food, and education).

In compliance with the legal and contractual obligations, the handbook lays out various safety requirements for foster homes, from ensuring that each home properly stores hazardous items to providing each child a bedroom with an individual bed. It also provides basic parenting requirements and generalized guidance: for example, providing children with family life, nutritious food, help with schoolwork, good hygiene, clothes, opportunities for religious and cultural development, proper medical care, and appropriate discipline. Failure to comply with these requirements could lead to Necco closing a foster home and removing the children. *See* W. Va. Code R. § 78-2-21.3.

As required, Necco trained and certified Steven and Charity Walls as foster parents. A week after Aubree arrived at the Wallses', she tragically died in her sleep.

3

Charity Walls had placed Aubree in a crib on her side with a rolled-up blanket, which a state investigation found to be a factor contributing to her death.

## II.

Blankenship alleges that Charity Walls negligently caused Aubree's death and that Necco is vicariously liable for that negligence.[1]  In granting summary judgment for Necco, the district court held that the agency was not liable for Charity Walls's negligence because foster parents are not the "employees" of a foster care agency.  We review this grant of summary judgment de novo.  *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003).

Under West Virginia law, an employer is vicariously liable for the negligence of an employee, servant, or agent acting within the scope of her authority or employment. *Musgrove v. Hickory Inn, Inc.*, 281 S.E.2d 499, 501 (W. Va. 1981).  By contrast, an employer is generally not vicariously liable for the negligence of an independent contractor.  *Peneschi v. Nat'l Steel Corp.*, 295 S.E.2d 1, 11 (W. Va. 1982) (citing Restatement (Second) of Torts § 409 (Am. Law Inst. 1965)); *Walton v. Cherokee Colliery Co.*, 73 S.E. 63, 63 (W. Va. 1911).

Whether an agent[2] is an employee or an independent contractor in West Virginia depends on four factors:  the employer's "(1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control."  *Shaffer*

---

[1] Blankenship has abandoned her claim that Necco itself was negligent in performing its duties (*e.g.*, by negligently placing the child with these foster parents).

[2] Though Necco argued in the alternative that the Wallses were not even their agents, we assume here that they were.

*v. Acme Limestone Co.*, 524 S.E.2d 688, 695 (W. Va. 1999) (quoting *Paxton v. Crabtree*, 400 S.E.2d 245, 248 (W. Va. 1990)).[3]

While all four factors are relevant, West Virginia courts pay "particular attention" to the element of control, *Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, 277 (W. Va. 2012) (per curiam), especially control over the process used to do the work. "[It] is the power over the process, not just the outcome, that demonstrates the essential feature of control such that a master-servant relationship exists." *Edwards v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 873 (S.D.W. Va. 2017) (citing *Robertson v. Morris*, 546 S.E.2d 770, 773 (W. Va. 2001)). While both an employee and an independent contractor must produce a final product that satisfies their employer, an employee is also subject to the employer's authority over the process by which the work is done. *See Robertson*, 546 S.E.2d at 773. The existence of that authority is what matters—whether or not it is actually exercised. *Shaffer,* 524 S.E.2d at 696 ("[T]he determining factor in connection with this matter is not the use of such right of control or supervision but the existence thereof in the person for whom the work is being done." (quoting *Spencer v. Travelers Ins. Co.*, 133 S.E.2d 735, 735 (1963)).

As one example, in *Shaffer*, West Virginia's Supreme Court of Appeals addressed the owner of a stone quarry's potential vicarious liability for the negligence of a trucking

---

[3] The state delegates to Necco the power to place children with foster parents (*i.e.*, hiring) and to remove children from foster homes (*i.e.*, firing). Yet these powers belong to the state, who is ultimately responsible for the children. *See* W. Va. Code § 49-2-101. Similarly, while Necco reimburses foster parents with a per diem, that cost is ultimately borne by the state through reimbursement. *See* Necco Foster Parent Handbook, J.A. 1117

company it used to deliver stone. 524 S.E.2d at 697. The quarry's owner directed the truckers when they should load their trucks to the legal weight limit, provided legally mandated safety information to the truckers, determined the compensation level for work done by the truckers, and suggested the routes for the truckers to deliver the stone. Yet the *Shaffer* court found that this general coordination and control did not make the truckers "employees" of the quarry. Instead, the Court held that

> an owner who engages an independent contractor to perform a job for him or her may retain broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the contract—including the right to inspect, to stop the work, to make suggestions or recommendations as to the details of the work, or to prescribe alterations or deviations in the work—without changing the relationship from that of owner and independent contractor, or [changing] the duties arising from that relationship.

*Id.* at 696 (alteration in original) (citation omitted); *see also id.* at 697 n.6 (citing Restatement (Second) of Torts § 414 cmt. c).

Here, Blankenship has produced evidence that Necco exercises high-level control over the care provided by foster parents, but she has not produced more than a scintilla of evidence indicating that Necco has the power to control the process of child rearing to the degree necessary to establish an employer-employee relationship with its foster parents. As part of its contract with the State, Necco must create an individualized plan for each child and ensure that the child receives necessary clothing, medical treatment as recommended by the child's physician, appropriate educational services, and transportation for local appointments. But Necco does not control how these broad

(noting that foster parents are reimbursed for expenses, not paid compensation or wages,

6

requirements are satisfied. Indeed, neither the Wallses' Foster Parent Agreement nor the Necco handbook directs how the foster parents must provide this necessary care. So while Necco must ensure that each child receives clothes, medical treatment, education, and opportunities for religious development, neither the Agreement nor the handbook indicates that Necco can dictate the manner in which foster parents provide those necessities.

And even these general requirements are mandated by state regulation. *See, e.g.*, W. Va. Code R. § 78-2-9 (listing the basic rights under state law of the foster child and the child's biological family). For example, the Necco handbook requires foster parents to provide "opportunities for development with the client's religious ethnic and cultural heritage," J.A. 1131, a requirement that corresponds with state regulations requiring foster care agencies to "ensure the opportunity for the child to attend the religious service of his or her choice if he or she expresses one" and "to participate in cultural and ethnic activities significant to his or her heritage." W. Va. Code R. § 78-2-9.5.c, -9.6.c. The handbook also demands that foster parents "[e]nsure that the client receives annual medical exams, dental exams and vision exams and that all follow-up recommendations are completed," J.A. 1131, an instruction echoing state regulations that mandate "[a]ppropriate medical screening, diagnosis, and treatment on a regular basis." W. Va. Code R. § 78-2-9.3.b.

Evidence that Necco communicates the applicable state laws and regulations to foster parents does not demonstrate Necco's power to control the parents. The agency

and so money paid to foster parents is not income for tax purposes).

does not decide whether foster parents comply with these requirements because it cannot allow foster parents to deviate from them. Necco informs foster parents about requirements imposed by the State, sometimes fleshing out the details, but Necco does not exercise control over the foster parents by simply passing along state regulations to them.[4]

Based on Blankenship's evidence, a reasonable jury could not infer that Necco had enough power of control over the Wallses' foster parenting to establish an employer-employee relationship with them under West Virginia law. Absent that inference, Necco cannot be vicariously liable for any negligence by the Wallses in caring for Aubree.

*        *        *

Accordingly, the judgment of the district court is

*AFFIRMED*.

---

[4] *See Shaffer*, 524 S.E.2d at 696 (because "the hazard training [the quarry owner] required of [trucking company] employees was imposed by law," such requirements did "not amount to showing 'power of control' within the meaning of *Paxton*"); *see also I.H. ex rel. Litz v. Cty. of Lehigh*, 610 F.3d 797, 808 (3d Cir. 2010) (finding under Pennsylvania law that a foster care agency does not control the behavior of foster parents when "the source of many of the more invasive requirements within the Placement Agreement [between the foster parents and the foster care agency] was the [State] itself— either through statute or regulation."); *Commerce Bank v. Youth Servs. of Mid-Illinois, Inc.*, 775 N.E.2d 297, 302 (Ill. App. Ct. 2002) ("[S]ince there was no evidence that defendant exercised day-to-day control over the [foster parents'] parenting beyond merely subjecting them to [state] regulations, the jury's finding of an agency relationship cannot stand."); *La Grande v. B & L Servs., Inc.*, 432 So. 2d 1364, 1367 (Fla. Dist. Ct. App. 1983) ("Here again, we would note that governmental regulation of workers should not be visited upon the putative employer in determining whether the latter has such control over the worker as would establish an employment relationship.").